# UNITED STATES *v.* MARINE BANCORPORATION, INC., ET AL.

No. 73–38.  Argued April 23, 1974—Decided June 26, 1974

604

*Deputy Solicitor General Friedman* argued the cause for the United States. With him on the brief were *Solicitor General Bork, Assistant Attorney General Kauper, Howard E. Shapiro,* and *George Edelstein.*

*R. A. Moen* argued the cause for appellees Marine Bancorporation, Inc., et al. With him on the brief was *James Wm. Johnston. Lee Loevinger* argued the cause for appellee Comptroller of the Currency. With him on the brief were *Robert Bloom* and *Jon D. Hartman.*

Mr. Justice Powell delivered the opinion of the Court.

The United States brought this civil antitrust action under § 7 of the Clayton Act, 38 Stat. 731, as amended, 15 U. S. C. § 18, to challenge a proposed merger between two commercial banks. The acquiring bank is a large, nationally chartered bank based in Seattle, Washington, and the acquired bank is a medium-size, state-chartered bank located at the opposite end of the State in Spokane. The banks are not direct competitors to any significant degree in Spokane or any other part of the State. They have no banking offices in each other's home cities. The merger agreement would substitute the acquiring bank for the acquired bank in Spokane and would permit the former for the first time to operate as a direct participant in the Spokane market.

The proposed merger would have no effect on the number of banks in Spokane. The United States bases its case exclusively on the potential-competition doctrine under § 7 of the Clayton Act. It contends that if the merger is prohibited, the acquiring bank would find an alternative and more competitive means for entering the Spokane area and that the acquired bank would ultimately develop by internal expansion or mergers with smaller banks into an actual competitor of the acquiring bank and other large banks in sections of the State outside Spokane. The Government further submits that the merger would terminate the alleged procompetitive influence that the acquiring bank presently exerts over Spokane banks due to the potential for its entry into that market.

After a full trial, the District Court held against the Government on all aspects of the case. We affirm that court's judgment. We hold that in applying the poten-

tial-competition doctrine to commercial banking, courts must take into account the extensive federal and state regulation of banks, particularly the legal restraints on entry unique to this line of commerce. The legal barriers to entry in the instant case, notably state-law prohibitions against *de novo* branching, against branching from a branch office, and against multibank holding companies, compel us to conclude that the challenged merger is not in violation of § 7.

# I

## BACKGROUND

*A. Facts.*

The acquiring bank, National Bank of Commerce (NBC), is a national banking association with its principal office in Seattle, Washington. Located in the northwest corner of the State, Seattle is the largest city in Washington. NBC is a wholly owned subsidiary of a registered bank holding company, Marine Bancorporation, Inc. (Marine), and in terms of assets, deposits, and loans is the second largest banking organization with headquarters in the State of Washington. At the end of 1971, NBC had total assets of $1.8 billion, total deposits of $1.6 billion, and total loans of $881.3 million.[1] It operates 107 branch banking offices within the State, 59 of which are located in the Seattle metropolitan area and 31 of which are in lesser developed sections of eastern Washington. In order of population, the four major

---

[1] By comparison, the largest banking organization with headquarters in Washington, Seattle-First National Bank, at the same time had assets of $2.8 billion, deposits of $2.5 billion, and loans of $1.4 billion. The figures shown here and in the text for NBC and Seattle-First National Bank take into account the operations of the two banks within and outside the State of Washington. Subsequent figures, see, *e. g.,* n. 3, *infra,* reflect operations solely within the State.

metropolitan areas in Washington are Seattle, Tacoma, Spokane, and Everett.   NBC has no branch offices in the latter three areas.

The target bank, Washington Trust Bank (WTB), founded in 1902, is a state bank with headquarters in Spokane.   Spokane is located in the extreme eastern part of the State, approximately 280 road miles from Seattle. It is the largest city in eastern Washington, with a population of 170,000 within the corporate limits and of approximately 200,000 in the overall metropolitan area. The city has a substantial commercial and industrial base.   The surrounding region is sparsely populated and is devoted largely to agriculture, mining, and timber. Spokane serves as a trade center for this region.   NBC, the acquiring bank, has had a longstanding interest in securing entry into Spokane.

WTB has seven branch offices, six in the city of Spokane and one in Opportunity, a Spokane suburb.   WTB is the eighth largest banking organization with headquarters in Washington and the ninth largest banking organization in the State.   At the end of 1971, it had assets of $112 million, total deposits of $95.6 million, and loans of $57.6 million.   It controls 17.4% of the 46 commercial banking offices in the Spokane metropolitan area.   It is one of 12 middle-size banks in Washington (*i. e.*, banks with assets in the $30 million to $250 million range).

WTB is well managed and profitable.   From December 31, 1966, to June 30, 1972, it increased its percentage of total deposits held by banking organizations in the Spokane metropolitan area from 16.6% to 18.6%.   The amount of its total deposits grew by approximately 50% during that period, a somewhat higher rate of increase than exhibited by all banking organizations operating in Spokane at the same time.[2]   Although WTB has exhibited

---

[2] See App. 1220.  The following table depicts the relative status

a pattern of moderate growth, at no time during its 70-year history has it expanded outside the Spokane metropolitan area.

As of June 30, 1972, there were 91 national and state banking organizations in Washington. The five largest in the State held 74.3% of the State's total commercial

of the six banking organizations operating in the Spokane metropolitan area from 1966 to mid-1972.

### DISTRIBUTION OF TOTAL DEPOSITS HELD BY BANKING ORGANIZATIONS IN THE SPOKANE METROPOLITAN AREA, 1966–1972

(dollars in thousands)

| Banking Organization | 12–31–66 $ | 12–31–66 % of Total | 6–30–72 $ | 6–30–72 % of Total |
|---|---|---|---|---|
| Washington Bancshares, Inc.* | 155,885 | 41.1 | 216,340 | 42.1 |
| Seattle-First National Bank | 145,251 | 38.3 | 162,220 | 31.6 |
| Washington Trust Bank | 63,102 | 16.6 | 95,464 | 18.6 |
| Sub Total | 364,238 | 96.1 | 474,024 | 92.3 |
| American Commercial Bank | 3,552 | .9 | 15,739 | 3.1 |
| Farmers and Merchants Bank | 5,593 | 1.5 | 12,558 | 2.5 |
| Pacific National Bank** | 5,801 | 1.5 | 11,152 | 2.2 |
| Total | 379,184 | 100.0 | 513,473 | 100.0 |

Note: Due to rounding, figures may not add to totals.

*Washington Bancshares, Inc., a bank holding company, owns two subsidiaries operating in Spokane, Old National Bank of Washington and First National Bank of Spokane. The deposit totals of these two banks are consolidated under the Washington Bancshares, Inc., entry in the above table.

**The bank at the bottom of the table is a branch (with two banking offices) of Pacific National Bank of Washington, which has its principal office in Seattle. This Seattle bank is in turn a subsidiary of Western Bancorporation, a multistate bank holding company with assets of approximately $14 billion.

bank deposits and operated 61.3% of its banking offices. At that time, the two largest in the State, Seattle-First National Bank and NBC, held 51.3% of total deposits and operated 36.5% of the banking offices in Washington.[3] There are six banking organizations operating in the Spokane metropolitan area. One organization, Washington Bancshares, Inc., controls two separate banks and their respective branch offices. As of midyear 1972, this organization in the aggregate held 42.1% of total deposits in the area. Seattle-First National Bank, by comparison, held 31.6%. The target bank held 18.6% of total deposits at that time, placing it third in the Spokane area behind Washington Bancshares, Inc., and Seattle-First National Bank. Thus, taken together, Washington Bancshares, Seattle-First National Bank, and WTB hold approximately 92% of total deposits in the Spokane area. None of the remaining three commercial banks in Spokane holds a market share larger than 3.1%.[4] One of these banks, Farmers & Merchants Bank, has offices only in a Spokane suburb.

The degree of concentration of the commercial banking business in Spokane may well reflect the severity of Washington's statutory restraints on *de novo* geographic expansion by banks. Although Washington permits branching, the restrictions placed on that method of in-

---

[3] See App. 1165. The relative size of banking organizations in Washington is indicated by a table introduced by the Government and set forth in the Appendix to this opinion. See *infra,* p. 643.

The degree of concentration in commercial banking in Washington has not increased significantly in the last decade. For the 12-year period ending December 31, 1971, the 10 largest banking organizations increased their aggregate share of total deposits by a single percentage point. WTB's percentage of total deposits in the State was essentially stable for this period, decreasing from 1.5% to 1.4%. From 1960 to 1971 the number of commercial banks in Washington increased by five.

[4] See n. 2, *supra.*

ternal growth are stringent. Subject to the approval of
the state supervisor of banking, Washington banks with
sufficient paid-in capital may open branches in the city
or town in which their headquarters are located, the un-
incorporated areas of the county in which their head-
quarters are located, and incorporated communities which
have no banking office. Wash. Rev. Code Ann. § 30.40.-
020 (Supp. 1973). But under state law, no state-chartered
bank "shall establish or operate any branch . . . in any city
or town outside the city or town in which its principal
place of business is located in which any bank, trust com-
pany or national banking association regularly transacts a
banking or trust business, except by taking over or acquir-
ing an existing bank, trust company or national banking
association . . . ." *Ibid.* Since federal law subjects na-
tionally chartered banks to the branching limitations im-
posed on their state counterparts,[5] national and state
banks in Washington are restricted to mergers or acquisi-
tions in order to expand into cities and towns with pre-
existing banking organizations.

The ability to acquire existing banks is also limited by
a provision of state law requiring that banks incorporat-
ing in Washington include in their articles of incorpora-
tion a clause forbidding a new bank from merging with
or permitting its assets to be acquired by another bank
for a period of at least 10 years, without the consent of
the state supervisor of banking. Wash. Rev. Code Ann.
§ 30.08.020 (7) (1961 and Supp. 1973).[6] In addition,

---

[5] 12 U. S. C. § 36 (c). See *First National Bank* v. *Dickinson,* 396
U. S. 122 (1969); *First National Bank* v. *Walker Bank,* 385 U. S.
252 (1966). Cf. *United States* v. *Philadelphia National Bank,* 374
U. S. 321, 328 (1963).

[6] This statute provides, in relevant part, that the articles of in-
corporation of any bank to be initiated in Washington shall state:

"(7) That for a stated number of years, which shall be not less
than ten nor more than twenty years from the date of approval of

once a bank acquires or takes over one of the banks operating in a city or town other than the acquiring bank's principal place of business, it cannot branch from the acquired bank. Wash. Rev. Code Ann. § 30.40.020 (Supp. 1973). Thus, an acquiring bank that enters a new city or town containing banks other than the acquired bank is restricted to the number of bank offices obtained at the time of the acquisition. Moreover, multibank holding companies are prohibited in Washington. Wash. Rev. Code Ann. § 30.04.230 (Supp. 1973).[7] Under state law, no

the articles (a) no voting share of the corporation shall, without the prior written approval of the supervisor, be affirmatively voted for any proposal which would have the effect of sale, conversion, merger, or consolidation to or with, any other banking entity or affiliated financial interest, whether through transfer of stock ownership, sale of assets, or otherwise, (b) the corporation shall take no action to consummate any sale, conversion, merger, or consolidation in violation of this subdivision, (c) this provision of the articles shall not be revoked, altered, or amended by the shareholders without the prior written approval of the supervisor, and (d) all stock issued by the corporation shall be subject to this subdivision and a copy hereof shall be placed upon all certificates of stock issued by the corporation."

[7] This statute provides:

"A corporation or association organized under the laws of this state, or licensed to transact business in the state, shall not hereafter acquire any shares of stock of any bank, trust company, or national banking association which, in the aggregate, enable it to own, hold, or control more than twenty-five percent of the capital stock of more than one such bank, trust company, or national banking association: *Provided, However,* That the foregoing restriction shall not apply as to any legal commitments existing on February 27, 1933: *And Provided, Further,* That the foregoing restriction shall not apply to prevent any such corporation or association which has its principal place of business in this state from acquiring additional shares of stock in a bank, trust company, or national banking association in which such corporation or association owned twenty-five percent or more of the capital stock on January 1, 1961.

"A person who does, or conspires with another or others in doing,

corporation in Washington may own, hold, or control more than 25% of the capital stock of more than one bank. *Ibid.* Violations of the one-bank holding company statute are gross misdemeanors carrying a possible penalty of forfeiture of a corporate charter. *Ibid.* Accordingly, it is not possible in Washington to achieve the rough equivalent of free branching by aggregating a number of unit banks under a bank holding company.[8]

## B. *The Proceedings.*

In February 1971, Marine, NBC, and WTB agreed to merge the latter into NBC. NBC, as the surviving bank, would operate all eight banking offices of WTB as branches of NBC. In March 1971, NBC and WTB applied to the Comptroller of the Currency pursuant to the

---

an act in violation of this section shall be guilty of a gross misdemeanor. A corporation that violates this section, or a corporation whose stock is acquired in violation hereof, shall forfeit its charter if it be a domestic corporation, or its license to transact business if it be a foreign corporation; and the forfeiture shall be enforced in an action by the state brought by the attorney general."

[8] The wisdom of inflexible limitations on *de novo* bank expansion like those in force in Washington has been questioned. *E. g.*, Baker, State Branch Bank Barriers and Future Shock—Will the Walls Come Tumbling Down?, 91 Banking L. J. 119 (1974); Comment, Bank Branching in Washington: A Need for Reappraisal, 48 Wash. L. Rev. 611 (1973). They inhibit growth by internal expansion and compel banks to resort to mergers and acquisitions in order to enter many new markets. Although other reasons no doubt exist, these limitations ostensibly are designed to prevent banks from encountering financial difficulties through overextending themselves, and they often date from the period of bank failures in the 1930's. If bank safety is their purpose, such restrictions may deserve reconsideration today in light of the extensive range of regulatory controls that otherwise exist, including federal and state supervision of the issuance of new bank charters, controls on interest rates and investments, deposit insurance, and regular, intensive bank inspections. Whatever their efficacy, a question that is not ours to resolve, such barriers to new entry are a fact of banking life in Washington.

Bank Merger Act of 1966 for approval of the merger.[9]  As required by that Act, see 12 U. S. C. § 1828 (c) (4), the Comptroller requested "reports on the competitive factors involved" from the Attorney General, the Federal Deposit Insurance Corporation, and the Board of Governors of the Federal Reserve System.  Each of these agencies submitted a negative report on the competitive effects of the merger.  The Attorney General relied on the reasons advanced in the instant case.  The latter two agencies based their conclusions primarily on the degree of concentration in commercial banking in Washington as a whole.

The Comptroller approved the merger in a report issued September 24, 1971.  He concluded that state law precluded NBC from branching in Spokane and "effectively prevented" NBC from causing a new Spokane bank to be formed which could later be treated as a merger partner.  He noted that state law prevented the only independent small bank with offices located within the city boundaries of Spokane from merging with NBC, since that bank was state chartered, had been founded in 1965, and was subject to the minimum 10-year restriction against sale of a new bank set out in Wash. Rev. Code

---

[9] See 80 Stat. 7, 12 U. S. C. §§ 1828 (c) (2) (A) and (c) (5).  If in a bank merger the "acquiring, assuming, or resulting bank is to be a national bank . . . ," the merger must receive prior written approval from the Comptroller of the Currency.  12 U. S. C. § 1828 (c) (2) (A).  The Comptroller shall not approve any proposed merger transaction

"whose effect in any section of the country may be substantially to lessen competition, or to tend to create a monopoly, or which in any other manner would be in restraint of trade, unless it finds that the anticompetitive effects of the proposed transaction are clearly outweighed in the public interest by the probable effect of the transaction in meeting the convenience and needs of the community to be served."  12 U. S. C. § 1828 (c) (5) (B).

Ann. § 30.08.020 (7) (1961 and Supp. 1973). The Comptroller relied heavily on the view that the merger would contribute to the convenience and needs of bank customers in Spokane by bringing to them services not previously provided by WTB.

Acting within the 30-day limitation period set out in the Bank Merger Act of 1966, 12 U. S. C. § 1828 (c) (7), the United States then commenced this action in the United States District Court for the Western District of Washington, challenging the legality of the merger under § 7 of the Clayton Act.[10] As a result, the merger was automatically stayed. 12 U. S. C. § 1828 (c) (7) (A). Pursuant to 12 U. S. C. § 1828 (c) (7) (D), the Comptroller intervened in support of the merger as a party defendant.

Prior to trial the United States dropped all allegations concerning actual competition between the merger partners.[11] The remainder of the complaint addressed the subject of potential competition. The United States

---

[10] Section 7 of the Clayton Act, 38 Stat. 731, as amended, 64 Stat. 1125, 15 U. S. C. § 18, provides in pertinent part:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

[11] In its complaint, the United States alleged that NBC and WTB were in direct competition due to the overlap of correspondent services and because NBC had two small branch offices located in Spokane County, although outside the Spokane metropolitan area. In a pretrial stipulation, however, the parties agreed that "there is no substantial existing competition between NBC and WTB in the Spokane metropolitan area or in any section of the country." App. 367.

sought to establish that the merger "may . . . substantially . . . lessen competition" within the meaning of § 7 in three ways: by eliminating the prospect that NBC, absent acquisition of the market share represented by WTB, would enter Spokane *de novo* or through acquisition of a smaller bank and thus would assist in deconcentrating that market over the long run; by ending present procompetitive effects allegedly produced in Spokane by NBC's perceived presence on the fringe of the Spokane market; and by terminating the alleged probability that WTB as an independent entity would develop through internal growth or through mergers with other medium-size banks into a regional or ultimately statewide counterweight to the market power of the State's largest banks. The Government's first theory—alleged likelihood of *de novo* or foothold entry by NBC if the challenged merger were blocked—was the primary basis upon which this case was presented to the District Court.[12]

At the close of final oral argument following a week-long trial, the District Judge ruled for the defendants from the bench. Two weeks later he adopted without change the defendants' proposed findings of facts and conclusions of law, the latter consisting of seven sentences. 1973–1 Trade Cas. ¶ 74,496, p. 94,244 (1973).[13]

---

[12] Brief for United States 27–28.

[13] In adopting, verbatim, proposed findings of fact in a complicated § 7 antitrust action, the District Court failed to heed this Court's admonition voiced a decade ago. *United States* v. *El Paso Natural Gas Co.*, 376 U. S. 651, 656–657 (1964). This has added considerably to our burden of reviewing the extensive record developed in this case. We have also been hampered by the absence of transcript citations in support of the District Court's findings. It is to be remembered that in a direct-appeal case like this one, we must apply the "clearly erroneous" standard of Fed. Rule Civ. Proc. 52 (a), just as the courts of appeals must in cases governed exclusively by 28 U. S. C. §§ 1291 and 1292. See, *e. g., United States* v. *General*

The court found that the merger would "substantially" increase competition in commercial banking in the Spokane metropolitan area and would have "no inherent anti-competitive effect . . . ." *Ibid.* In light of the legal and economic barriers to any other method of entry, the court further found "no reasonable probability" that, absent the challenged merger, NBC would enter the Spokane market in the "reasonably foreseeable future." *Id.,* at 94,245.

According to the District Court, Washington law forbade NBC from establishing *de novo* branches in Spokane, and the Government had failed to establish that there was any existing bank in Spokane other than WTB "available for acquisition by NBC on any reasonably acceptable basis at any time in the foreseeable future, or at all." *Ibid.* Moreover, any attempt by NBC to enter *de novo* by assisting in the formation of and then acquiring a newly chartered bank in Spokane "even if it could be legally accomplished," [14] or to undertake a foothold

---

*Dynamics Corp.,* 415 U. S. 486 (1974). We welcome any assistance in performance of the role, as do, undoubtedly, the courts of appeals.

With regard to the skeletal conclusions of law entered by the District Court, we reiterate that direct appeals of such cases, "the trials of which usually result in long and complex factual records, come here without the benefit of any sifting by the Courts of Appeals." *El Paso Natural Gas Co., supra,* at 663 (separate opinion of Harlan, J.). Accordingly, if the District Court does not enter an opinion analyzing the relevant precedents in light of the record, we are deprived of this helpful guidance.

[14] The court's reservations about the legality of this alleged potential method of entry by NBC into Spokane reflect the fact that the procedure is analogous in substance to *de novo* branching, yet under state law NBC is prohibited from establishing new branches in Spokane. See Wash. Rev. Code Ann. § 30.40.020 (Supp. 1973). The parties are in sharp disagreement over whether the state branching statute proscribes the sponsorship and subsequent acquisition of a

acquisition, would not be economically feasible. *Ibid.* In addition to noting the past and projected slow growth of the Spokane area, the court found that the ability to branch in a metropolitan area was essential to effective competition in the banking business. *Ibid.* Under state law, NBC would be unable to open new branch offices in Spokane if it made a foothold acquisition or helped form and then acquired a new bank. These and other factors rendered "negative" the prospects for growth of a foothold acquisition or of a sponsored bank started from scratch. *Ibid.* This was confirmed by the experience of another large banking organization not based in Spokane that had entered the city through a foothold acquisition in 1964 and subsequently had been unable to expand the market share of the acquired bank. *Id.,* at 94,245–94,246.

The court found no perceptible procompetitive effect deriving from NBC's premerger presence on the fringe of the Spokane market. *Id.,* at 94,246. It also held that the Government had failed to carry its burden of proving a reasonable probability that WTB, absent the merger, would expand beyond the Spokane market by *de novo* growth or through combination with another medium-size bank. *Ibid.* It found no probability that NBC would be "entrenched as a dominant bank in the

---

new bank. The Government contends that the formation of a new national bank is not governed by state-law restrictions on branching, citing 12 U. S. C. §§ 26, 27. Appellees respond in essence that this would still constitute *sub rosa* branching in violation of state law. The formation of a new national bank in Spokane would in any event require approval for a new charter from the Comptroller of the Currency. In this regard, the District Court gave "great weight" to the testimony of the Regional Administrator of National Banks that it was unlikely that a charter for a new national bank in Spokane would be granted within the foreseeable future. 1973–1 Trade Cas. ¶ 74,496, p. 94,245.

Spokane metropolitan area" as a result of the merger, and it could find no likelihood that the merger would trigger a series of defensive mergers by other banks in the State. *Id.*, at 94,246–94,247.[15]

On the basis of its findings, the District Court dismissed the Government's complaint. The Government thereupon brought this direct appeal under the Expediting Act, 32 Stat. 823, as amended, 15 U. S. C. § 29. We noted probable jurisdiction. 414 U. S. 907 (1973).

## II

## THE RELEVANT MARKETS

Determination of the relevant product and geographic markets is "a necessary predicate" to deciding whether a merger contravenes the Clayton Act. *United States* v. *Du Pont & Co.,* 353 U. S. 586, 593 (1957); *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 324 (1962). The District Court found that the relevant product market "within which the competitive effect of the merger is to be judged" is the "business of commercial banking (and the cluster of products and services denoted thereby)...." 1973–1 Trade Cas. ¶ 74,496, p. 94,243. The parties do

---

[15] The District Court also issued extensive findings of fact concerning the "convenience and needs" defense set out in the Bank Merger Act of 1966, 12 U. S. C. § 1828 (c) (5) (B). The court found in essence that NBC, as a full-service bank, would bring to the Spokane area a broad range of banking services that WTB, due to its limited size, is unable to provide. These included increased loan limits, different types of loans, international banking services, computer services, enhanced trust services, and other benefits. The court's findings on this subject led it to the conclusion that even if the merger violated the standards of the Clayton Act, it was nevertheless lawful under the Bank Merger Act of 1966. 1973–1 Trade Cas. ¶ 74,496, pp. 94,247–94,251. In light of our conclusion with regard to § 7 of the Clayton Act, we do not address the District Court's findings under the "convenience and needs" defense.

not dispute· this finding, and in any event it is in full accord with our precedents.[16]

The District Court found that the relevant geographic market is the Spokane metropolitan area, "consisting of the City of Spokane and the populated areas immediately adjacent thereto, including the area extending easterly through· the suburb of Opportunity toward the Idaho border . . . ." *Id.*, at 94,244. This area extends approximately five miles to the west and south and 10 miles to the north and east of the center of the city. It is wholly within and considerably smaller than Spokane County and is surrounded by a sparsely populated region, with no nearby major metropolitan centers. It contains all eight of the target bank's offices. On the basis of the record, we have no reason to doubt that it constitutes a reasonable approximation of the "localized" banking market in which Spokane banks offer the major part of their services and to which local consumers can practicably turn for alternatives. *E. g., United States* v. *Phillipsburg National Bank,* 399 U. S. 350, 362–365 (1970). It is also the area where "the effect of the merger on competition will be direct and immediate . . . ," which as this Court has held is the appropriate "section of the country" for purposes of § 7. *United States* v. *Philadelphia National Bank,* 374 U. S. 321, 357 (1963). Accordingly, we affirm the District Court's holding that the Spokane metropolitan area is the appropriate geographic market for determining the legality of the merger.

Prior to trial the Government stipulated that the Spokane area is a relevant geographic market in the instant

---

[16] See *United States* v. *Phillipsburg National Bank,* 399 U. S. 350, 359–362 (1970); *United States* v. *Third National Bank,* 390 U. S. 171, 182 n. 15 (1968); *United States* v. *Philadelphia National Bank,* 374 U. S., at 356–357. See also *United States* v. *Alcoa,* 377 U. S. 271, 275 n. 3 (1964);· *United States* v. *First National Bank,* 376 U. S. 665, 667 (1964).

case, and there is no dispute that it is the only banking market in which WTB is a significant participant. Nevertheless, the Government contends that the entire State is also an appropriate "section of the country" in this case. It is conceded that the State is not a banking market. But the Government asserts that the State is an economically differentiated region, because its boundaries delineate an area within which Washington banks are insulated from most forms of competition by out-of-state banking organizations. The Government further argues that this merger, and others it allegedly will trigger, may lead eventually to the domination of all banking in the State by a few large banks, facing each other in a network of local, oligopolistic banking markets. This assumed eventual statewide linkage of local markets, it is argued, will enhance statewide the possibility of parallel, standardized, anticompetitive behavior. This concern for the possible statewide consequences of geographic market extension mergers by commercial banks appears to be an important reason for the Government's recent efforts to block such mergers through an application of the potential-competition doctrine under § 7.[17]

The Government's proposed reading of the "any section of the country" phrase of § 7 is at variance with this Court's § 7 cases, and we reject it. Without exception the Court has treated "section of the country" and "relevant geographic market" as identical,[18] and it has defined

---

[17] See, e. g., Baker, Potential Competition in Banking: After Greeley, What?, 90 Banking L. J. 362 (1973); Solomon, Bank Merger Policy and Problems: A Linkage Theory of Oligopoly, 89 Banking L. J. 116 (1972).

[18] The Court's first case under amended § 7 referred to "section of the country" and "geographic market" in the same breath, see Brown Shoe Co. v. United States, 370 U. S. 294, 324 (1962) ("a geographic market (the 'section of the country')"), as did the Court's first § 7 bank merger case. See Philadelphia National Bank, supra,

the latter concept as the area in which the goods or services at issue are marketed to a significant degree by the acquired firm. *E. g., Philadelphia National Bank, supra,* at 357–362.[19] In cases in which the acquired firm markets its products or services on a local, regional, and national basis, the Court has acknowledged the existence of more than one relevant geographic market.[20] But in no previous § 7 case has the Court determined the legality of a merger by measuring its effects on areas where the acquired firm is not a direct competitor. In

at 356 ("'section of the country' (relevant geographical market)"). See also *Phillipsburg National Bank, supra,* at 362–365. Identity between "section of the country" and relevant geographic market has been assumed in the § 7 potential-competition cases. *E. g., United States* v. *Falstaff Brewing Corp.,* 410 U. S. 526, 527 (1973); *United States* v. *Continental Can Co.,* 378 U. S. 441, 447 (1964).

[19] If a challenged combination takes the form of a joint venture by which two firms plan to enter a new area simultaneously, the relevant geographic market is the section of the country in which the newly formed enterprise will market its goods. See *United States* v. *Penn-Olin Chemical Co.,* 378 U. S. 158 (1964).

[20] See, *e. g., United States* v. *Pabst Brewing Co.,* 384 U. S. 546 (1966). Some of the Court's language in *Pabst* suggests that the Government may challenge a merger under § 7 without establishing any relevant geographic market, see *id.,* at 549–550, a suggestion that prompted separate opinions by MR. JUSTICE WHITE, *id.,* at 555, by Mr. Justice Harlan, joined by MR. JUSTICE STEWART, *ibid.,* and by Mr. Justice Fortas. *Id.,* at 561. But *Pabst* in reality held that the Government had established three relevant markets in which the acquired firm actually marketed its products—a single State, a multistate area, and the Nation as a whole. See *id.,* at 550–551. And in that case the acquiring firm was an actual competitor of the acquired firm in all three relevant geographic markets. *Ibid.* Thus while *Pabst* stands for the proposition that there may be more than one relevant geographic market, it did not abandon the traditional view that for purposes of § 7 "section of the country" means "relevant geographic market" and the latter concept means the area in which the relevant product is in fact marketed by the acquired firm.

urging that the legality of this merger be gauged on a statewide basis, the Government is suggesting that we take precisely that step, because, as it concedes, the section of the country in which WTB markets by far the greatest portion of its services, due to the predominantly localized character of commercial banking, is the Spokane metropolitan area.[21] Under the precedents, we decline the Government's invitation. We hold that in a potential-competition case like this one, the relevant geographic market or appropriate section of the country is the area in which the acquired firm is an actual, direct competitor.

Apart from the fact that the Government's statewide approach is not supported by the precedents, it is simply too speculative on this record. There has been no persuasive showing that the effect of the merger on a statewide basis "may be substantially to lessen competition" within the meaning of § 7. To be sure, § 7 was designed to arrest mergers "at a time when the trend to a lessening of competition in a line of commerce [is] still in its incipiency." *Brown Shoe Co.,* 370 U. S., at 317. See, *e. g., United States* v. *Von's Grocery Co.,* 384 U. S. 270, 277 (1966). Moreover, the proscription expressed in § 7 against mergers "when a 'tendency' toward monopoly .or [a] 'reasonable likelihood' of a substantial lessening of competition in the relevant market is shown," *United States* v. *Penn-Olin Chemical Co.,* 378 U. S. 158, 171 (1964), applies alike to actual- and potential-competition cases. *Ibid.* But it is to be remembered that § 7 deals

---

[21] The record demonstrates in several ways the local character of the area over which WTB exerts a competitive influence. For example, as of January 31, 1972, 90.1% of WTB's deposit accounts originated within the Spokane metropolitan area; 4.1% originated elsewhere in Spokane County; and the remainder came from eastern Washington, western Washington, and other States. App. 1861.

in "probabilities," not "ephemeral possibilities." *Brown Shoe Co., supra,* at 323.[22]   The Government's underlying concern for a linkage or network of statewide oligopolistic banking markets is, on this record at least, considerably closer to "ephemeral possibilities" than to "probabilities."   To assume, on the basis of essentially no evidence, that the challenged merger will tend to produce a statewide linkage of oligopolies is to espouse a *per se* rule against geographic market extension mergers like the one at issue here.   No § 7 case from this Court has gone that far,[23] and we do not do so today.   For the purpose of this case, the appropriate "section of the country" and the "relevant geographic market" are the same—the Spokane metropolitan area.

## III

## POTENTIAL-COMPETITION DOCTRINE

The term "potential competitor" appeared for the first time in a § 7 opinion of this Court in *United States* v. *El Paso Natural Gas Co.,* 376 U. S. 651, 659 (1964). *El Paso* was in reality, however, an actual-competition rather than a potential-competition case.[24]   The potential-

---

[22] As MR. JUSTICE MARSHALL noted in *Falstaff Brewing Corp., supra,* at 555 (separate opinion), "remote possibilities are not sufficient to satisfy the test set forth in § 7."   Rather, the loss of competition "which is sufficiently probable and imminent" is the concern of § 7.   *United States* v. *Continental Can Co., supra,* at 458.

[23] We put aside cases where an acquiring firm's market power, existing capabilities, and proposed merger partner are such that the merger would produce an enterprise likely to dominate the target market (a concept known as entrenchment).   See *FTC* v. *Procter & Gamble Co.,* 386 U. S. 568 (1967).   Cf. *Falstaff Brewing Corp., supra,* at 531.   There is no allegation that the instant merger would produce entrenchment in the Spokane market.

[24] The merger declared unlawful in *El Paso* "removed not merely a potential, but rather an actual, competitor."   Turner, Conglomerate

competition doctrine has been defined in major part by subsequent cases, particularly *United States* v. *Falstaff Brewing Corp.*, 410 U. S. 526 (1973).[25] Unequivocal proof that an acquiring firm actually would have entered *de novo* but for a merger is rarely available.[26] Thus, as *Falstaff* indicates, the principal focus of the doctrine is on the likely effects of the premerger position of the acquiring firm on the fringe of the target market. In developing and applying the doctrine, the Court has recognized that a market extension merger may be unlawful if the target market is substantially concentrated, if the acquiring firm has the characteristics, capabilities, and economic incentive to render it a perceived potential

---

Mergers and Section 7 of the Clayton Act, 78 Harv. L. Rev. 1313, 1371 (1965). Accord, Berger & Peterson, Conglomerate Mergers and Criteria for Defining Potential Entrants, 15 Antitrust Bulletin 489, 498 (1970); Davidow, Conglomerate Concentration and Section Seven: The Limitations of the Anti-Merger Act, 68 Col. L. Rev. 1231, 1242 n. 36 (1968). Prior to the acquisition at issue in *El Paso*, the acquired firm had entered a tentative supply contract with one of the acquiring firm's substantial customers in the relevant market, compelling the acquiring firm to make significant price and delivery concessions in order to retain that customer. 376 U. S., at 654–655, 659. The acquired firm was thus "shown by [the] record to have been a substantial factor in the [relevant] market at the time it was acquired . . . ." *Id.*, at 658. The degree of entry that the acquired firm had achieved into the market of the acquiring firm distinguishes *El Paso* from subsequent cases truly presenting a potential-competition situation. It also distinguishes *El Paso* from the instant case, where the record demonstrates no analogous penetration of WTB's market by NBC or of NBC's market by WTB.

[25] See also *Ford Motor Co.* v. *United States*, 405 U. S. 562, 567–568 (1972); *id.*, at 591–592 (separate opinion of Burger, C. J.); *FTC* v. *Procter & Gamble Co.*, *supra*; *United States* v. *Continental Can Co.*, *supra*; *United States* v. *Penn-Olin Chemical Co.*, *supra*.

[26] See Brodley, Oligopoly Power Under the Sherman and Clayton Acts—From Economic Theory to Legal Policy, 19 Stan. L. Rev. 285, 357–358 (1967).

*de novo* entrant, and if the acquiring firm's premerger presence on the fringe of the target market in fact tempered oligopolistic behavior on the part of existing participants in that market. In other words, the Court has interpreted § 7 as encompassing what is commonly known as the "wings effect"—the probability that the acquiring firm prompted premerger procompetitive effects within the target market by being perceived by the existing firms in that market as likely to enter *de novo*. *Falstaff, supra,* at 531–537.[27] The elimination of such present procompetitive effects may render a merger unlawful under § 7.

Although the concept of perceived potential entry has been accepted in the Court's prior § 7 cases, the potential-competition theory upon which the Government places principal reliance in the instant case has not. The Court has not previously resolved whether the potential-competition doctrine proscribes a market extension merger solely on the ground that such a merger eliminates the prospect for long-term deconcentration of an oligopolistic market that in theory might result if the acquiring firm were forbidden to enter except through a *de novo* undertaking or through the acquisition of a small existing entrant (a so-called foothold or toehold acquisition). *Falstaff* expressly reserved this issue.[28]

---

[27] See also, Robinson, Antitrust Developments: 1973, 74 Col. L. Rev. 163, 180–190 (1974); Berger & Peterson, *supra;* Davidow, *supra;* Turner, *supra,* at 1362–1386; Hale & Hale, Potential Competition Under Section 7: The Supreme Court's Crystal Ball, 1964 Sup. Ct. Rev. 171; Note, United States v. Falstaff Brewing Corporation: Potential Competition Re-examined, 72 Mich. L. Rev. 837 (1974).

[28] See 410 U. S., at 537:

"We leave for another day the question of the applicability of § 7 to a merger that will leave competition in the marketplace exactly as it was, neither hurt nor helped, and that is challengeable under § 7 only on grounds that the company could, but did not, enter *de novo*

The Government's potential-competition argument in the instant case proceeds in five steps. First, it argues that the potential-competition doctrine applies with full force to commercial banks. Second, it submits that the Spokane commercial banking market is sufficiently concentrated to invoke that doctrine. Third, it urges us to resolve in its favor the question left open in *Falstaff*. Fourth, it contends that, without regard to the possibility of future deconcentration of the Spokane market, the challenged merger is illegal under established doctrine because it eliminates NBC as a perceived potential entrant. Finally, it asserts that the merger will eliminate WTB's potential for growth outside Spokane. We shall address those points in the order presented.

*A. Application of the Doctrine to Commercial Banks.*

Since *United States* v. *Philadelphia National Bank,* 374 U. S. 321 (1963), the Court has taken the view that, as a general rule, standard § 7 principles applicable to unregulated industries apply as well to mergers between commercial banks. See also *United States* v. *First National Bank,* 376 U. S. 665 (1964). Congress reacted to *Philadelphia National Bank* by including in the Bank Merger Act of 1966 a "convenience and needs" defense uniquely applicable to commercial banks. 12 U. S. C. §§ 1828 (c) (5)(B) and (c)(7)(B). Subsequent cases have revealed, however, that that defense comes into play only after a district court has made a *de novo* determination of the status of a bank merger under the Clayton Act. See *United States* v. *Third National Bank,* 390 U. S. 171 (1968); *United States* v. *First City National Bank,* 386 U. S. 361 (1967). As the Court noted in *Phillipsburg National Bank, supra,* "the antitrust standards of . . .

---

or through 'toe-hold' acquisition and that there is less competition than there would have been had entry been in such a manner."

*Philadelphia National Bank* . . . were preserved in the Bank Merger Act of 1966." 399 U. S., at 358.[29]

Although the Court's prior bank merger cases have involved combinations between actual competitors operating in the same geographic markets, an element that distinguishes them factually from this case, they nevertheless are strong precedents for the view that § 7 doctrines are applicable to commercial banking. In accord with the general principles of those cases, we hold that geographic market extension mergers by commercial banks must pass muster under the potential-competition doctrine. We further hold, however, that the application of the doctrine to commercial banking must take into account the unique federal and state regulatory restraints on entry into that line of commerce. Failure to do so would produce misconceptions that go to the heart of the doctrine itself.

The Government's present position has evolved over a series of eight District Court cases, all of them decided unfavorably to its views.[30] The conceptual difficulty

---

[29] See, *e. g.*, Kintner & Hansen, A Review of the Law of Bank Mergers, 14 B. C. Ind. & Com. L. Rev. 213 (1972); Alcorn, Phillipsburg and Beyond—Developing Trends in Substantive Standards for Bank Mergers, 9 Houston L. Rev. 417 (1972); Shull & Horvitz, The Bank Merger Act of 1960: A Decade After, 16 Antitrust Bulletin 859 (1971); Lifland, The Supreme Court, Congress, and Bank Mergers, 32 Law & Contemp. Prob. 15 (1967); Via, Antitrust and the Amended Bank Merger and Holding Company Acts: The Search for Standards, 53 Va. L. Rev. 1115 (1967). Cf. Wu & Connell, Merger Myopia: An Economic View of Supreme Court Decisions on Bank Mergers, 59 Va. L. Rev. 860 (1973).

[30] In addition to the District Court decision in this case, see *United States* v. *Connecticut National Bank,* 362 F. Supp. 240 (Conn. 1973), vacated and remanded, *post,* p. 656; *United States* v. *United Virginia Bankshares, Inc.,* 347 F. Supp. 891 (ED Va. 1972); *United States* v. *First National Bancorporation, Inc.,* 329 F. Supp. 1003 (Colo. 1971), aff'd *per curiam,* 410 U. S. 577 (1973); *United*

with the Government's approach, and an important reason why it has been uniformly unsuccessful in the district courts, is that it fails to accord full weight to the extensive federal and state regulatory barriers to entry into commercial banking.[31]  This omission is of great importance, because ease of entry on the part of the acquiring firm is a central premise of the potential-competition doctrine.[32]

Unlike, for example, the beer industry, see *Falstaff Brewing Corp., supra,* entry of new competitors into the commercial banking field is "wholly a matter of governmental grace . . ." and "far from easy." *Philadelphia National Bank, supra,* at 367, and n. 44.  Beer manufacturers are free to base their decisions regarding entry and the scale of entry into a new geographic market on nonregulatory considerations, including their own financial capabilities, their long-range goals as to mar-

---

*States* v. *Idaho First National Bank,* 315 F. Supp. 261 (Idaho 1970); *United States* v. *First National Bank of Maryland,* 310 F. Supp. 157 (Md. 1970); *United States* v. *First National Bank of Jackson,* 301 F. Supp. 1161 (SD Miss. 1969); *United States* v. *Crocker-Anglo National Bank,* 277 F. Supp. 133 (ND Cal. 1967) (three-judge court).

[31] See Robinson, *supra,* at 189 n. 162; Shenefield, Annual Survey of Antitrust Developments—The Year of the Regulated Industry, 31 Wash. & Lee L. Rev. 1, 37–39 (1974); Hale & Hale, *supra,* at 179.

[32] This Court's potential-competition cases have repeatedly noted this factor. *E. g., FTC* v. *Procter & Gamble Co.,* 386 U. S., at 580; *United States* v. *Continental Can Co.,* 378 U. S., at 464–465.  See J. Bain, Industrial Organization 8 (2d ed. 1968): "The condition of entry . . . determines the relative force of potential competition as an influence or regulator on the conduct and performance of sellers already established in a market."  See also P. Areeda, Antitrust Analysis 517 (1967): "The sight of a particular firm 'waiting at the market's edge' may emphasize the entry threat, but it is ease of entry, not necessarily an identifiable potential entrant, that limits present market power by reminding existing firms that high profits will attract outsiders."

kets, the cost of creating new production and distribution facilities, and above all the profit prospects in the target market. They need give no thought to public needs and convenience. No comparable freedom exists for commercial banks. Ease of entry into a market presumes ease of exit—*i. e.,* the withdrawal or financial collapse of a certain number of participants in that market. Reflecting this country's bitter experience of four decades ago that "[a] bank failure is a community disaster . . . ,"[33] entry into and exit from the commercial banking business have been extensively regulated by the Federal and State Governments. The regulatory barriers to entry include federal and state supervisory controls over the number of bank charters to be granted, designed to limit the number of banks operating in any particular market and thus to prevent bank failures. See *id.,* at 328. In addition, no branch, no matter how small, may be opened without prior approval of the appropriate bank regulatory agency. Moreover, there are state-law restrictions, such as those in force in Washington, on *de novo* geographic expansion through branching and multibank holding companies. As noted earlier, Washington statutes forbid branching into cities and towns where the expanding bank does not maintain its headquarters and other banks operate, and they forbid branching from a branch in such areas. See *supra,* at 609–611. Similarly, Washington permits only one-bank holding companies. *Supra,* at 611–612.

In *Philadelphia National Bank, supra,* the Court relied on regulatory barriers to entry to support its conclusion that mergers between banks in direct competition in the same market must be scrutinized with particular care under § 7. 374 U. S., at 352, 367–370, 372. But the same

---

[33] *Philadelphia National Bank,* 374 U. S., at 375 (Harlan, J., dissenting).

restrictions on new entry render it difficult to hold that a geographic market extension merger by a commercial bank is unlawful under the potential-competition doctrine. Such limitations often significantly reduce, if they do not eliminate, the likelihood that the acquiring bank is either a perceived potential *de novo* entrant or a source of future competitive benefits through *de novo* or foothold entry. Similarly, the Court noted in *Philadelphia National Bank* that under applicable state law *de novo* branching in the relevant market was permissible and presented an "alternative to the merger route . . . ." *Id.,* at 370. In this case, by contrast, there are serious questions whether an "alternative to the merger route" through branching or a functional equivalent is a legal or feasible method of entry by NBC into the Spokane market.

### B. Structure of the Spokane Market.

Since the legality of the challenged merger must be judged by its effects on the relevant product and geographic markets, commercial banking in the Spokane metropolitan area, it is imperative to determine the competitive characteristics of commercial banking in that section of the country. The potential-competition doctrine has meaning only as applied to concentrated markets. That is, the doctrine comes into play only where there are dominant participants in the target market engaging in interdependent or parallel behavior and with the capacity effectively to determine price and total output of goods or services. If the target market performs as a competitive market in traditional antitrust terms, the participants in the market will have no occasion to fashion their behavior to take into account the presence of a potential entrant. The present procompetitive effects that a perceived potential entrant may produce in an

oligopolistic market will already have been accomplished if the target market is performing competitively. Likewise, there would be no need for concern about the prospects of long-term deconcentration of a market which is in fact genuinely competitive.

In an effort to establish that the Spokane commercial banking market is oligopolistic, the Government relied primarily on concentration ratios indicating that three banking organizations (including WTB) control approximately 92% of total deposits in Spokane. The District Court held against the Government on this point, finding that "a highly competitive market" existed which "does not suffer from parallel or other anticompetitive practices attributable to undue market power." 1973–1 Trade Cas. ¶ 74,496, p. 94,246. The court apparently gave great weight to the testimony of the banks' expert witnesses concerning the number of bank organizations and banking offices operating in the Spokane metropolitan area. The record indicates that neither the Government nor the appellees undertook any significant study of the performance, as compared to the structure, of the commercial banking market in Spokane.

We conclude that by introducing evidence of concentration ratios of the magnitude of those present here the Government established a prima facie case that the Spokane market was a candidate for the potential-competition doctrine. On this aspect of the case, the burden was then upon appellees to show that the concentration ratios, which can be unreliable indicators of actual market behavior, see *United States* v. *General Dynamics Corp.*, 415 U. S. 486 (1974), did not accurately depict the economic characteristics of the Spokane market. In our view, appellees did not carry this burden, and the District Court erred in holding to the contrary. Appellees introduced no significant evidence of the absence of paral-

lel behavior in the pricing or providing of commercial bank services in Spokane.[34]

We note that it is hardly surprising that the Spokane commercial banking market is structurally concentrated. As the Government's expert witness conceded, *all* banking markets in the country are likely to be concentrated.[35] This is so because as a country we have made the policy judgment to restrict entry into commercial banking in order to promote bank safety. Thus, most banking markets in theory will be subject to the potential-competition doctrine. But the same factor that usually renders such markets concentrated and theoretical prospects for potential-competition § 7 cases—regulatory barriers to new entry—will also make it difficult to establish that the doctrine invalidates a particular geographic market extension merger.

## C. Potential De Novo or Foothold Entry.

The third step in the Government's argument, resolution of the question reserved in *Falstaff*, was the primary basis on which the case was presented to the District

---

[34] The marketing of many forms of commercial bank services is controlled by government regulation. For example, regulation, not concentration in a banking market, produces parallelism with respect to such important elements of the banking business as interest allowed on savings accounts and interest charged on home mortgage loans. There are also many individualized judgments in the banking business, such as the decision whether to extend credit in various cases, that are not prone to parallel behavior regardless of the concentration of a market. Nevertheless, unfettered competition among banks does exist in a number of areas important to the public, as evidenced by the much-advertised differences in various forms of services offered by banks within the same geographic market. It is with regard to the latter economic activity that actual market behavior, and especially the presence or absence of significant parallel conduct, becomes relevant in this type of case.

[35] App. 534.

Court [36] and to us. The Government contends that the
challenged merger violates § 7 because it eliminates the
alleged likelihood that, but for the merger, NBC would
enter Spokane *de novo* or through a foothold acquisition.
Utilization of one of these methods of entry, it is argued,
would be likely to produce deconcentration of the Spo-
kane market over the long run or other procompetitive
effects, because NBC would be required to compete vigor-
ously to expand its initially insignificant market share.

Two essential preconditions must exist before it is pos-
sible to resolve whether the Government's theory, if
proved, establishes a violation of § 7. It must be deter-
mined: (i) that in fact NBC has available feasible means
for entering the Spokane market other than by acquiring
WTB; and (ii) that those means offer a substantial likeli-
hood of ultimately producing deconcentration of that
market or other significant procompetitive effects. The
parties are in sharp disagreement over the existence of
each of these preconditions in this case. There is no dis-
pute that NBC possesses the financial capability and in-
centive to enter. The controversy turns on what meth-
ods of entry are realistically possible and on the likely
effect of various methods on the characteristics of the
Spokane commercial banking market.

It is undisputed that under state law NBC cannot es-
tablish *de novo* branches in Spokane and that its parent
holding company cannot hold more than 25% of the
stock of any other bank. Entry for NBC into Spokane
therefore must be by acquisition of an existing bank.
The Government contends that NBC has two distinct al-
ternatives for acquisition of banks smaller than WTB
and that either alternative would be likely to benefit the
Spokane commercial banking market.

First, the Government contends that NBC could ar-

---

[36] Brief for United States 27–28.

range for the formation of a new bank (a concept known as "sponsorship"), insure that the stock for such a new bank is placed in friendly hands, and then ultimately acquire that bank. Appellees respond that this approach would violate the spirit if not the letter of state-law restrictions on bank branching. They note that this method would require the issuance of either a state or a national charter, and they assert that neither state nor federal banking authorities would be likely to grant a charter for a new bank in a static, "well-banked" market like Spokane. Moreover, it is argued that such officials would be certain to refuse to do so where the purpose of the scheme was to avoid the requirements of the state branching law.[37] Appellees further note that the stock and assets of any new state bank in Washington are inalienable for at least 10 years without approval of state banking officials, see Wash. Rev. Code Ann. § 30.08.020 (7), and they argue that such officials would refuse to grant approval for sale as part of a sponsorship plan.

The Government counters by pointing to instances in which sponsorship-acquisition of small banks by large banks has occurred in Washington, on occasion with the apparent knowledge and asserted approval of bank regulatory officials and within less than 10 years of the formation of the new bank.[38] Indeed, the Government contends that NBC is presently sponsoring a small bank in an unrelated area of Washington with the purpose of ultimate acquisition and conversion of the bank into a branch of NBC. Appellees reply that if sponsorship by other banks has occasionally occurred, it is nonetheless

[37] The Government called as a witness a former state supervisor of banking. On cross-examination, this witness testified that if the purpose of the organization of a new bank were to establish a potential branch for another bank, he would not regard that as a proper objective under state chartering statutes. App. 768–770.

[38] Cf. Comment, 48 Wash. L. Rev. 611, 626–628 (1973).

illegal under state law and that prior instances of tolerated illegality do not convert an illegal process into a legal one. NBC also denies that it has ever engaged in sponsorship solely for the purpose of acquisition, and it insists that even if a new bank is sponsored there is no guarantee that the sponsor, rather than some other bank willing to outbid it, will acquire the sponsored bank.[39] Appellees further point out, as is confirmed by the record, that the United States has not shown that any bank in Washington has ever used sponsorship-acquisition as a means of entering a major metropolitan area. In fact, the Government's principal witness in support of its sponsorship theory conceded on cross-examination that his bank "wouldn't consider trying to use that method in getting into" a major city.[40]

In its findings and conclusions, the District Court did not resolve the question of the status of the Government's proposed sponsorship-acquisition approach under Washington's banking statutes.[41] We similarly decline to decide this issue. Although we note that the intricate

---

[39] The Government did not establish that NBC has ever acquired a bank that it had assisted in starting. It did offer substantial evidence that NBC has assisted in the formation of a new bank in south-central Washington, outside any major metropolitan area. NBC undertook this effort in response to the desire of one of its major clients to have a bank in that area. But NBC has no contractual right to acquire that bank, and indeed there is no guarantee that it will ultimately be successful in acquiring it.

[40] App. 614.

[41] During the trial, the District Judge commented from the bench that he could not see "anything civilly wrong" with the Government's proposed sponsorship-acquisition approach. He apparently assumed that it was possible. App. 870. In its findings, the court took the view that such a method of entry was not economically feasible, in light of state-law restrictions on branching from a branch and the characteristics of the banking business. 1973–1 Trade Cas. ¶ 74,496, p. 94,245.

procedure for entry by sponsorship espoused by the Government can scarcely be compared to the *de novo* entry opportunities available to unregulated enterprises such as beer producers, see *Falstaff, supra,* we will assume, *arguendo,* that NBC conceivably could succeed in sponsoring and then acquiring a new bank in Spokane at some indefinite time in the future. It does not follow from this assumption, however, that this method of entry would be reasonably likely to produce any significant procompetitive benefits in the Spokane commercial banking market. To the contrary, it appears likely that such a method of entry would not significantly affect that market.

State law would not allow NBC to branch from a sponsored bank after it was acquired. NBC's entry into Spokane therefore would be frozen at the level of its initial acquisition. Thus, if NBC were to enter Spokane by sponsoring and acquiring a small bank, it would be trapped into a position of operating a single branch office in a large metropolitan area with no reasonable likelihood of developing a significant share of that market.[42] This assumed method of entry therefore would offer little realistic hope of ultimately producing deconcentration of the Spokane market. Moreover, it is unlikely that a

---

[42] NBC's acquisition of WTB, by comparison, will give it eight banking offices in Spokane and a significant market share. From this position, NBC will be able to have a substantial impact on the Spokane market.

The Government suggests that a sponsored bank could create a number of branches before being acquired. Brief for United States 50 n. 47. The Government offered no proof that this has ever occurred in Washington. Undertaking sponsorship on such a scale is probably unrealistic, and it would multiply the problems of obtaining approval of a sponsorship plan from bank regulatory agencies. In any event, nothing in § 7 of the Clayton Act requires a firm to go to such lengths in order to avoid a merger that has no effect on concentration in the relevant market in the first place.

single new bank in Spokane with a small market share, and forbidden to branch, would have any other significant procompetitive effect on that market. The Government introduced no evidence, for example, establishing that the three small banks presently in Spokane have had any meaningful effect on the economic behavior of the large Spokane banks. In sum, it blinks reality to conclude that the opportunity for entry through sponsorship, assuming its availability, is comparable to the entry alternatives open to unregulated industries such as those involved in this Court's prior potential-competition cases [43] or would be likely to produce the competitive effects of a truly unfettered method of entry. Since there is no substantial likelihood of procompetitive loss if the challenged merger is undertaken in place of the Government's sponsorship theory, we are unable to conclude that the effect of the former "may be substantially to lessen competition" within the meaning of the Clayton Act.

As a second alternative method of entry, the Government proposed that NBC could enter by a foothold acquisition of one of two small, state-chartered commercial banks that operate in the Spokane metropolitan area.[44] Appellees reply that one of those banks is located in a suburb and has no offices in the city of Spokane, that after an acquisition NBC under state law could not branch from the suburb into the city, and that such a

---

[43] E. g., United States v. Falstaff Brewing Corp., 410 U. S. 526 (1973); FTC v. Procter & Gamble Co., 386 U. S., at 580.

[44] The third small bank in Spokane is a branch of a large nationally chartered bank in Seattle, which in turn is owned by a large holding company. There is no allegation that this small bank is a potential foothold acquisition. The Government presses its foothold-acquisition approach with considerably less vigor than its sponsorship theory, which may reflect the fact that under the former approach the total number of banking organizations in Spokane would remain the same.

peripheral foothold cannot be viewed as an economically feasible method of entry into the relevant market. Appellees also point out that the second small bank was chartered in 1965 and thus under state law would not have been available for acquisition until at least four years after the 1971 NBC–WTB merger agreement.

Granting the Government the benefit of the doubt that these two small banks were available merger partners for NBC, or were available at some not too distant time, it again does not follow that an acquisition of either would produce the long-term market-structure benefits predicted by the Government. Once NBC acquired either of these banks, it could not branch from the acquired bank. This limitation strongly suggests that NBC would not develop into a significant participant in the Spokane market, a prospect that finds support in the record. In 1964, one of the largest bank holding companies in the country, through its Seattle-based subsidiary, acquired a foothold bank with two offices in Spokane. Eight years later this bank, Pacific National Bank, held a mere 2.2% of total bank deposits in the Spokane metropolitan area, an insignificant increase over its share of the market at the date of the acquisition. See n. 2, *supra.* An officer of this bank, called as a witness by the Government, attributed the poor showing to an inability under state law to establish further branches in Spokane.[45]

In sum, with regard to either of its proposed alternative methods of entry, the Government has offered an unpersuasive case on the first precondition of the question reserved in *Falstaff*—that feasible alternative methods of entry in fact existed. Putting these difficulties aside, the Government simply did not establish the second precondition. It failed to demonstrate that the alternative means

---

[45] App. 1103.

offer a reasonable prospect of long-term structural improvement or other benefits in the target market. In fact, insofar as competitive benefits are concerned, the Government is in the anomalous position of opposing a geographic market extension merger that will introduce a third full-service banking organization to the Spokane market, where only two are now operating, in reliance on alternative means of entry that appear unlikely to have any significant procompetitive effect.[46]   Accordingly, we cannot hold for the Government on its principal potential-competition theory.   Indeed, since the preconditions for that theory are not present, we do not reach it, and therefore we express no view on the appropriate resolution of the question reserved in *Falstaff*.   We reiterate that this case concerns an industry in which new entry is extensively regulated by the State and Federal Governments.

## D. Perceived Potential Entry.

The Government's failure to establish that NBC has alternative methods of entry that offer a reasonable likelihood of producing procompetitive effects is determinative of the fourth step of its argument.   Rational commercial bankers in Spokane, it must be assumed, are aware of the regulatory barriers that render NBC an unlikely or an insignificant potential entrant except by merger with WTB.   In light of those barriers, it is improbable that

---

[46] Cf. *Falstaff Brewing Corp., supra,* at 561 (separate opinion of MARSHALL, J.):

"If the company would have remained outside the market but for the possibility of entry by acquisition, and if it is exerting no influence as a perceived potential entrant, then there will normally be no competitive loss when it enters by acquisition.   Indeed, there may even be a competitive gain to the extent that it strengthens the market position of the acquired firm."   (Footnote omitted.)

NBC exerts any meaningful procompetitive influence over Spokane banks by "standing in the wings."

Moreover, the District Court found as a fact that "the threat of entry by NBC into the Spokane market by any means other than the consummation of the merger, to the extent any such threat exists, does not have any significant effect on the competitive practices of commercial banks in that market nor any significant effect on the level of competition therein." 1973-1 Trade Cas. ¶ 74,496, p. 94,246. In making this finding, it appears that the District Court "appraised the economic facts" about NBC and the Spokane market "in order to determine whether in any realistic sense [NBC] could be said to be a potential competitor on the fringe of the market with likely influence on existing competition." *Falstaff*, 410 U. S., at 533-534 (footnote omitted). Our review of the record indicates that the court's finding was not in error. The Government's only hard evidence of any "wings effect" was a memorandum written in 1962 by an officer of NBC expressing the view that Spokane banks were likely to engage in price competition as NBC approached their market. Evidence of an expression of opinion by an officer of the acquiring bank, not an official of a bank operating in the target market, in a memorandum written a decade prior to the challenged merger does not establish a violation of § 7.

*E. Elimination of WTB's Potential for Growth.*

In the final step of its argument, the Government challenges the merger on the ground that it will eliminate the prospect that WTB may expand outside its base in Spokane and eventually develop into a direct competitor with large Washington banks in other areas of the State. The District Court found, however, that the Government had "failed to establish . . . that there is any reasonable probability that WTB will expand into

other banking markets . . . ." 1973–1 Trade Cas. ¶ 74,496, p. 94,246. The record amply supports this finding. At no time in its 70-year history has WTB established branches outside the Spokane metropolitan area. Nor has it ever acquired another bank[47] or received a merger offer other than the one at issue here.[48] In sum, the Government's argument about the elimination of WTB's potential for expansion outside Spokane is little more than speculation. It provides no sound basis for overturning the District Court's holding.

## IV

## CONCLUSION

In applying the doctrine of potential competition to commercial banking, courts must, as we have noted, take into account the extensive federal and state regulation of banks. Our affirmance of the District Court's judgment in this case rests primarily on state statutory barriers to *de novo* entry and to expansion following entry into a new geographic market. In States where such stringent barriers exist and in the absence of a likelihood of entrenchment, the potential-competition doctrine— grounded as it is on relative freedom of entry on the part of the acquiring firm—will seldom bar a geographic market extension merger by a commercial bank. In States that permit free branching or multibank holding companies, courts hearing cases involving such mergers should take into account all relevant factors, including the barriers to entry created by state and federal control over the issuance of new bank charters. Testimony by responsible regulatory officials that they will not grant new charters in the target market is entitled to great weight, although it is not determinative. To avoid the

---

[47] App. 931.

[48] *Id.*, at 933.

danger of subjecting the enforcement of the antitrust laws to the policies of a particular bank regulatory official or agency, courts should look also to the size and growth prospects of the target market, the size and number of banking organizations participating in it, and past practices of regulatory agencies in granting charters. If regulatory restraints are not determinative, courts should consider the factors that are pertinent to any potential-competition case, including the economic feasibility and likelihood of *de novo* entry, the capabilities and expansion history of the acquiring firm, and the performance as well as the structural characteristics of the target market.

The judgment is

*Affirmed.*

Mr. Justice Douglas took no part in the decision of this case.

[For appendix to opinion of the Court, see *post,* p. 643.]

Mr. Justice White, with whom Mr. Justice Brennan and Mr. Justice Marshall join, dissenting.

For the second time this Term, the Court's new antitrust majority has chipped away at the policies of § 7 of the Clayton Act. In *United States* v. *General Dynamics Corp.,* 415 U. S. 486 (1974), the majority sustained the failing-company defense in a new guise. Here, it redefines the elements of potential competition and dramatically escalates the burden of proving that a merger "may be substantially to lessen competition" within the meaning of § 7.

That we are dealing with a severely concentrated commercial banking market in the Spokane metropolitan area is conceded. The Court also proceeds on the basis that it was open to the Government to make its case by

# APPENDIX TO THE OPINION OF THE COURT

TOTAL DEPOSITS HELD BY THE 2 LARGEST, 5 LARGEST, 10 LARGEST, AND REMAINING COMMERCIAL BANKING ORGANIZATIONS OF THE STATE OF WASHINGTON IN THE STATE OF WASHINGTON—June 30, 1972

| Bank Organizations | No. of Offices | Percent of Total | Deposits 000's | Percent of Total | Rank in State |
|---|---|---|---|---|---|
| Seattle-First National Bank—Seattle | 144 | 20.96 | $2,054,951 | 31.71 | 1 |
| National Bank of Commerce—Seattle | 107 | 15.57 | 1,268,132 | 19.57 | 2 |
| TOTAL 2 LARGEST BANKING ORGANIZATIONS | 251 | 36.54 | $3,323,083 | 51.27 | |
| Pacific National Bank of Washington—Seattle | 64 | 9.32 | 650,342 | 10.03 | 3 |
| Peoples National Bank of Washington—Seattle | 55 | 8.01 | 468,063 | 7.22 | 4 |
| Washington Bancshares, Inc.—Spokane | 51 | 7.42 | 372,739 | 5.75 | 5 |
| TOTAL 5 LARGEST BANKING ORGANIZATIONS | 421 | 61.28 | $4,814,227 | 74.28 | |
| Puget Sound National Bank—Tacoma | 29 | 4.22 | 227,429 | 3.51 | 6 |
| Bank of California—Seattle and Tacoma | 2 | .29 | 199,878 | 3.08 | 7 |
| Seattle Trust & Savings Bank—Seattle | 26 | 3.78 | 172,801 | 2.67 | 8 |
| Washington Trust Bank—Spokane | 8 | 1.16 | 96,518 | 1.49 | 9 |
| Everett Trust & Savings Bank | 13 | 1.89 | 91,034 | 1.40 | 10 |
| TOTAL 10 LARGEST BANKING ORGANIZATIONS | 499 | 72.63 | $5,601,887 | 86.43 | |
| 81 REMAINING BANKING ORGANIZATIONS | 188 | 27.37 | $879,183 | 13.57 | |
| 91 BANKING ORGANIZATIONS | 687 | 100.00 | $6,481,070 | 100.00 | |

Note: Due to rounding, figures may not add to totals.

proving that the NBC–WTB merger would probably cause a substantial lessening of competition in either one of two ways. First, it could be proved that NBC, with the resources and desire to enter the Spokane market, would probably have entered the market either by acquiring one of the small Spokane banks or by sponsoring a new bank and ultimately acquiring it. The merger thus deprived the Spokane market of a new competitor, and produced the requisite anticompetitive effect. Second, it could be shown that NBC's resources and interest in entering the Spokane market were so obvious to or recognized by those already in the market that, as a potential competitor waiting in the wings, NBC very probably exercised a restraining influence on anticompetitive practices in the concentrated Spokane banking market.

The majority does not quibble about the fact of NBC's resources and its incentive to extend its banking activities into Spokane. NBC is the State's second largest banking organization with total assets of $1.8 billion as of 1971. It has branched widely in the State of Washington, having a total of 107 branches, 15 of them within 100 miles of Spokane. Two other Seattle banking organizations were already operating in Spokane; and NBC itself had seriously negotiated for an acquisition in that market. Given the opportunity, NBC would obviously enter Spokane. Under Washington law, it could not branch there; but it was free to acquire another bank, given consent of banking authorities. That consent was obtained for the acquisition involved in this case, and it may fairly be assumed that it could have been obtained for the acquisition, not of a major competitor contributing to the concentration in the Spokane market, but of one of the smaller banks—a so-called "toehold" position in the market.

Another mode of entry into Spokane was also available to NBC. It could have been instrumental in form-

ing a new bank in that market and in due course could have merged with the "sponsored" institution. It is argued that this route was all but legally unavailable to NBC,[1] but the sponsored-bank method of expansion has occurred frequently in the State of Washington. The District Court did not hold sponsorship barred by state law. This Court also refrains from so holding and proceeds on the assumption that the sponsored-bank route was available to NBC. Under state law, a merger with the new bank could not take place, without the consent of banking authorities, prior to 10 years from the date the new bank began operations; but consent to merge prior to that time has been obtained in the past.

Thus, although branching into Spokane was not legally feasible, there were other modes of entry no less

---

[1] The evidence, based upon past practices, is entirely to the contrary. NBC has itself employed the procedure with regard to the Columbia Center National Bank located in a shopping center in south central Washington. The techniques it employed included finding an organizer for the bank, controlling the sublease of the land on which the new bank was to be located, through Marine Bancorporation, so as to prevent acquisition by others without its approval, and making sure the majority stock of the bank was in friendly hands. App. 246–280. The record abounds with various examples of the technique by other Washington banks; and federal authorities were aware of many of the methods, as disclosed in the applications for approval of acquisition by the sponsors. The statute also forbids a new bank from merging with or permitting its assets to be acquired by another bank for a period of 10 years but only *without* the consent of the state supervisor. Suffice it to state that earlier acquisitions have, as the majority recognizes, been made in the past. Surely the fragmentary fears of illegality are not enough to overturn what seems a perfectly well-established technique of market entry not at odds with the language of the state statute. It should be noted that the District Court, although not formally ruling on the state law matter in its findings of fact and conclusions of law, did state during trial that this was, in its view, a feasible means of entry. App. 870.

attractive or less feasible than entering by establishing a new branch. It is incredible that if branching into Spokane had been allowable NBC would not have entered in this way. It is equally unlikely that absent the understandably attractive merger with WTB, NBC would not have proceeded to acquire a smaller bank or to be instrumental in forming a new sponsored bank.

The Court apparently assumes this to be the case, but goes on to hold that the Government's proof failed because neither a small new bank nor one of the existing small banks, if acquired, had a realistic chance of deconcentrating the Spokane market to any substantial extent. Also, absent the capability of making substantial inroads on the market shares of the principal banks, it is said that those banks had nothing to fear from NBC as a potential competitor and that NBC therefore had no current influence on competitive practices in the Spokane market.

I part company with the majority at this point. The Spokane market was highly concentrated. NBC had the resources and the desire to enter the market. There were no impenetrable legal or economic barriers to its doing so; and it is sufficiently plain from the record that absent merger with WTB, NBC could and would either have made a toehold entry or been instrumental in establishing a sponsored bank in Spokane. But NBC chose to merge with a larger bank and to deprive the market of the competition it would have offered had it entered in either of two other ways. In my opinion, this made out a sufficient prima facie case under § 7, which, absent effective rebuttal, entitled the United States to judgment.

The Court's sole answer to the Government's proof is that even if NBC would have entered by acquisition or *de novo* through a sponsored bank, it would have "little realistic hope of ultimately producing deconcen-

tration of the Spokane market." This was because under Washington law after acquiring an existing or newly formed bank, NBC could not branch from that institution but would be confined to the banking offices which it acquired at the time of the merger. In the Court's opinion, NBC, without branching, would have "no reasonable likelihood of developing a significant share of that market," and the Government's case therefore failed.

I cannot accept the *per se* view that, without branching, an able and willing newcomer to the banking market cannot be considered a sufficiently substantial competitive influence, immediately or in the foreseeable future, so that its loss to the market would warrant application of § 7. This is particularly true if the putative entrant is a large and successful banking organization with wide experience in developing new markets.

Small banks can be profitable, and they can grow rapidly. The experience of the three small banks in Spokane proves this. Each of them is a profitable bank. The profits of American Commercial Bank, for example, with headquarters in downtown Spokane, rose from $27,740 in 1966 to $132,527 in 1971. The deposits of each of the three small banks have grown. From 1966 to 1972, total bank deposits in the Spokane metropolitan area rose from $379.2 million to $513.5 million, a growth of 35% in six years. Spokane would not appear to be a stagnant banking market, and it provides opportunities for smaller banking concerns. The deposits in the three small banks during the same six years grew from $14.9 million to $39.4 million, an increase of approximately 160%. Their market share, although remaining relatively small, increased from 3.9% to 7.8%. Of course, deposits in the three large banking organizations also grew. Two of them increased their market shares very

slightly, but the third lost ground from 38.3% to 31.6%, for a combined decline of the three from 96% to 92.3%. The small banks thus more than held their own in the Spokane market. This showing of the smaller banks hardly indicates such impotence on the part of small competitors that a new entrant in the market should necessarily be deemed to be without influence in the market and to be beyond recognition under § 7.[2]

If Seattle-First National Bank, with 31.6% of the deposits in 1972, or Washington Bancshares, Inc., with 42.1%, had acquired either American Commercial Bank or Farmers & Merchants Bank, with 3.1% and 2.5% respectively of Spokane bank deposits, the merger would have been anticompetitive and forbidden by § 7, unless saved by the convenience-and-needs proviso of the Bank Merger Act. *United States* v. *Philadelphia National Bank*, 374 U. S. 321 (1963). Depriving the market of a *new* competitor that could achieve similar status in a rela-

---

[2] The banks rely on the experience of Pacific National Bank of Washington. In 1964, a large bank holding company acquired a toehold in Spokane by acquiring an existing small bank, but by 1972 had only garnered 2.2% of the total bank deposits in Spokane. A vice president of the bank testified at trial that its disappointing share of the market—its 1972 share of industrial and commercial loans was 4.6%—was probably due to its inability to branch. Although this officer also testified that his bank was not opposing the merger of NBC and WTB, he certainly was an interested party. Upon this witness' opinion, the outcome of this case cannot hinge. In light of the objective evidence, which strongly suggests that competition can exist without equality in branch capability, the testimony of this vice president should not be given great weight. It is not only a speculative statement as to the failure of the Pacific National; it is also self-serving to the extent it keeps additional competitors out of the market. As with the testimony of bank officials who profess no interest in entering a market, see *United States* v. *Falstaff Brewing Corp.*, 410 U. S. 526, 534–535 (1973), it should only be considered along with the rest of the objective economic evidence.

tively short period of time should not be so readily placed beyond the reach of § 7 when considering the application of the doctrine of potential competition to market extension mergers.

The details on the relative size of individual bank branches in Spokane or elsewhere in metropolitan areas of the State are not in the record; but it is unbelievable that there are no branches that have started very small and grown very large. New branches must make their way, often in head-to-head competition with other banks. Some are more successful than others, and I cannot accept, as a *per se* legal rule, the notion that a new bank sponsored by NBC in downtown Spokane or elsewhere in the city must be forever deemed to be without substantial competitive impact on the banking community.[3] It is incredible to me that the presence of a major Seattle bank like NBC in downtown Spokane could or would be ignored by the entrenched banking powers or should be ignored for the purposes of applying § 7 of the Clayton Act.

NBC has 15 branches within a 100-mile radius of Spokane. Those branches have $103 million in total

---

[3] Evidence introduced by the Government as to the ability of banks in the other major metropolitan banking markets of Washington—Seattle, Tacoma, and Everett—totally undercuts the Court's assumption that a bank with only one office cannot acquire a substantial enough market share to effect deconcentration. In Seattle, the Bank of California, with only one office, had $112 million in total deposits in 1970, representing 6.27% of the total deposit market. This share can be compared with that of Pacific National Bank of Washington which, with 13 offices, had a 9.38% market share. In Tacoma, the Bank of California-Tacoma had $65.4 million in total deposits which represented a 15.55% market share. Compare this with the 3.17% share of Seattle-First National Bank-Tacoma, with four offices. In Everett, Peoples National Bank of Washington-Everett, with one office, had $17.2 million in total deposits, a 10.83% market share.

deposits, including $4.4 million from Spokane customers. Two of these branches are in Spokane County and between them have $11 million in deposits. They also have loans totaling $10.2 million to Spokane interests. NBC is a major financial institution with large lending limits and offering a full line of commercial banking services. It is obviously equipped to penetrate and compete vigorously in the Spokane lending market wholly aside from how fast deposits might grow in a newly established or acquired Spokane bank. It is quite untenable to assert that the competition that might be offered in the Spokane lending market by a new bank formed by this obviously vigorous competitor is too insignificant to warrant the protections of § 7.[4]

The availability of branching is, of course, an important competitive consideration, but it should not be forgotten that American Commercial Bank, headquartered in downtown Spokane, has four branches and if acquired by NBC would give that bank a substantial operating capacity in Spokane. The majority, nevertheless, even assuming the acquisition of this bank by NBC, insists on its own view of competitive reality and holds

---

[4] As the majority recognizes, the relevant product market in this case is the cluster of services offered by commercial banks. A main component of that cluster, and one which determines profits, is the ability to provide loans, and it seems to me that a prospect of competition for loans, whether based on deposits garnered in Spokane or elsewhere, has a substantial possibility of effecting deconcentration in at least one segment of the banking business. The fact that profitability and number of offices are not highly correlated is supported by comparing the experience of Washington Bancshares and Seattle-First National Bank. In 1971, the former had 23 offices and a net income of $2.2 million. The latter, with only seven offices, had a net income of $3.5 million. In that same year, although Washington Bancshares had $45.6 million more in deposits than did Seattle-First National, the latter had an edge of $7.2 million in commercial and industrial loans.

that the loss of NBC as a competitor in place of American must be deemed an insignificant loss to competition. This is true even though one of the major competitors, Seattle-First National Bank, has only seven branches and under the state law already referred to, it is confined to its existing branches.

It is also true that if NBC entered Spokane by sponsoring a new bank, the new bank itself could legally branch and create the necessary branch infrastructure for as long as it was not acquired by NBC or another outsider. The majority states that this is "probably unrealistic" and that it would "multiply the problems" of obtaining approval of sponsorship from bank regulatory agencies. But this is sheer speculation; the Court simply has no idea what the attitude of regulatory officials would be in this regard. Furthermore, NBC itself has had experience with sponsored-bank situations, and, as the majority recognizes, it asserts that it has not sponsored banks solely for the purpose of acquisition. Apparently, relationships with a sponsored institution are themselves of inherent value, and the benefits would only increase if the sponsored bank itself branched as it grew.

Viewed in this light, the Court's *per se* rule becomes threadbare indeed when applied to NBC entering by acquisition into the Spokane market. The three existing smaller banks in Spokane have been successful and profitable and have even increased their share of the market in six years. Furthermore, Seattle-First National cannot legally go beyond its present seven branches in the Spokane market, and its share of the market has declined. It is quite unreasonable to think that NBC, if it acquired American Commercial, with its four branches could not be an effective competitor at least against Seattle-First National in Spokane, with its seven branches, or against WTB with its eight.

The Court also errs in holding that NBC, an obvious potential competitor, cannot be deemed to have exercised substantial influence on the Spokane market and that its entry by merger with a major Spokane bank therefore represents no probable injury to competition in that market. To the extent that the Court's holding on this branch of the case rests on its notion that no bank, without branching, can make substantial inroads on the Spokane market, I disagree for reasons already stated. Beyond that, however, the waiting-in-the-wings approach to potential competition rests on what objective factors indicate the perception of the reasonably minded competitor in the Spokane market might be of the likelihood and impact of an entry by NBC, either *de novo* or by acquisition of a small bank. Predictions of market behavior and competitive success are just not as certain or uniformly held as the Court makes them out to be. Here, before NBC acquired WTB, NBC negotiated to acquire the much smaller Farmers & Merchants Bank—a three-office suburban bank with about $13 million in deposits and 2.5% of the market. The target bank was in the relevant geographic market accepted by the parties and Court. The President of Marine Bancorporation, Maxwell Carlson, had at various times noted that the President and Director of WTB, Philip Stanton, expected NBC to be in Spokane some day. One wonders, if the majority's branch-disability theory is correct, why these bankers even discussed potential entry into the market. The fact is that they did, and it is fair to assume that through informal contacts, and by reason of the prior acquisition discussions, bankers in the market were aware of NBC's interest. The majority would have one believe that even if NBC was interested, no one in the market would take it seriously enough to restrain anticompetitive practices. It is certainly possible, however, that even if bankers in the market doubted that NBC would actually

be successful in acquiring a significant market share, if they entered the market, the *possibility* of entry and the *possibility* of competition following entry were sufficiently strong to restrain anticompetitive practices. If bankers thought that there was a probability of entry, which there surely was, but that their losses from such entry could be substantial, if NBC, once in the market, competed more effectively than anticipated, they would take countermeasures and make entry less attractive by refraining from engaging in anticompetitive practices.

In the last analysis, one's view of this case, and the rules one devises for assessing whether this merger should be barred, turns on the policy of § 7 of the Clayton Act to bar mergers which may contribute to further concentration in the structure of American business. *United States* v. *Philadelphia National Bank,* 374 U. S., at 362–363; *United States* v. *Penn-Olin Chemical Co.,* 378 U. S. 158, 170–171 (1964); *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 331–332 (1962). The dangers of concentration are particularly acute in the banking business, since "if the costs of banking services and credit are allowed to become excessive by the absence of competitive pressures, virtually all costs, in our credit economy, will be affected . . . ." *Philadelphia Bank, supra,* at 372; *United States* v. *Phillipsburg National Bank,* 399 U. S. 350, 358 (1970).

Unless an otherwise illegal merger is saved by a finding under the Bank Merger Act that it is necessary to serve the convenience and needs of the community, the law requires us in the first instance to judge bank mergers by normal § 7 standards. I simply cannot agree with the Court's narrow view of what bank mergers "may . . . substantially . . . lessen competition."

With respect to whether depriving the market of the competition offered by a new entrant violates § 7, it is not enough under the Court's view that the newcomer

has itself found the market sufficiently attractive to enter and to assume all the start-up costs and risks attendant to a new business undertaking. The Court is willing also to assume that the new business will be profitable and long-lived, for under the approach taken today, it is not enough to show the loss of one or more profitable but small businesses. Apparently, it cannot be assumed that a small business, even when backed by a major enterprise. can or will be successful in competing against the entrenched powers in the market.

This thesis erects formidable barriers to the application of the potential-competition doctrine not only in the banking business but in other lines of commerce.[5] To show that the potential entrant, waiting in the wings, is exercising a present influence on the market, or that its loss as a *de novo* or toehold entrant may be a substantial injury to competition, it will not be enough to prove ability and willingness to enter, along with the probability, or even certainty, of entry. Nor will it suffice to prove that the potential or actual entrant would be a profitable concern and successfully prevent the major figures in the market from increasing their market shares. The courts must also examine conditions in the market and conclude for themselves that there is a realistic expectation that the new entrant will appropriate for itself a substantial part of the business of the major competitors in the market.

---

[5] The Court professes to limit its *per se* rule to "an industry in which new entry is extensively regulated by the State and Federal Governments." The case, as decided, however, does not turn on barriers to entry, but "barriers" to effective competition, once entry is effected, and "barriers" to effective competition are not easily limited to regulated industries. The Court lays itself open for arguments that economic, as well as legal, barriers exist for new competitors. At least it is difficult to see why one should be more controlling than another; in fact, the Court itself blurs the two.

The Court then delivers the *coup de grace* by imposing its own visions of reality in commercial banking markets: without unlimited branching authority in the market involved, no newcomer to the market can be sufficiently successful against others, who have the authority, to be a substantial competitor and to merit recognition under doctrines of potential competition. No new entrant can attain, let us say, 15 or 20 percent of the banking business in the Spokane area unless it has branching authority. The Court apparently insists this will be true no matter where the new banking office is located and no matter who and how well equipped and financed the new entrant may be. This is claiming a prescience that I doubt the Court has and is a view of the effectiveness and worth of competition, though having modest beginnings, that I do not share. Furthermore, the conclusion the Court reaches passes beyond my comprehension when it refuses to concede that NBC, if it acquired American Commercial Bank, with its four branches, could not make substantial inroads on the market shares of any of the major banks in the market, even though one of them is forever limited to seven offices under the present law.