**UNITED STATES of America, Plaintiff,**

v.

**HUGHES TOOL COMPANY et al., Defendants.**

No. CV 74–2544–JWC.

United States District Court, C. D. California.

May 27, 1976.

Leon W. Weidman, Brian Q. Robbins, Edwin D. Hausmann, and Jonathan C. Gordon, Antitrust Div., Dept. of Justice, Los Angeles, Cal., for plaintiff.

Carl J. Schuck, Samuel E. Ericsson, and Valerie Baker of Overton, Lyman & Prince, Los Angeles, Cal., and Alfred H. Ebert, Jr. and Larry B. Phillips, III, of Andrews, Kurth, Campbell & Jones, Houston, Tex., for defendants Hughes Tool Company and Byron Jackson, Inc.

Paul G. Bower and J. Edd Stepp, Jr., of Gibson, Dunn & Crutcher, Los Angeles, Cal., for defendant Borg-Warner Corp.

## OPINION

CURTIS, District Judge.

The government brings this action to enjoin Hughes Tool Company from acquiring Byron Jackson, Inc., a wholly owned subsidiary of Borg-Warner Corporation, upon the grounds that such acquisition will·violate section 7 of the Clayton Act (15 U.S.C. § 18). This court earlier denied a preliminary injunction but ordered the defendants to maintain the acquired business separate and apart from other operations until final disposition of the case.

## BACKGROUND

Hughes Tool Company (Hughes) is a Delaware corporation with its principal manufacturing facilities in Houston, Texas. Borg-Warner Corporation (Borg-Warner) is a Delaware corporation with general offices in Chicago, Illinois. Byron Jackson, Inc. (BJ) is a Delaware corporation maintaining general offices in Long Beach, California.

Prior to 1972, Hughes' business operations had been conducted by the Oil Tool Division of Howard Hughes' privately owned corporation. However, in 1972, the oil tool division was taken over by a new corporation, Hughes Tool Company, the defendant herein, all of whose stock is now publicly owned.

Hughes is primarily engaged in the development, manufacture and sale of rotary bits used in drilling oil and gas wells, and in the manufacture and sale of tool joints, threaded couplings which are welded to each end of a section of drill pipe and provide the means through .which the sections can be joined together·to form a drill string. Hughes has been an acknowledged leader in drill bit and tool joint production for at least the past twenty years but also manufactures a few other products. These other products have little relevance to this case and represent less than ten percent of Hughes' 1973 sales of $122 million.[1]

Borg-Warner is a large diversified manufacturing company whose products relate

---

1. Hughes also makes large diameter drilling equipment for mining and construction industries, diggers for utility pole placement, impacters for attachment to tractor-mounted back-

primarily to the transportation industry. Its 1973 sales amounted to $1.5 billion. Borg-Warner has little contact with the drilling industry except through BJ.

BJ is primarily a well servicing company, specializing in cementing and stimulation services for oil and gas wells. It also manufactures and sells oil field rubber products. Neither of these, however, come within the scope of the government's attack. The government seeks to prevent Hughes' acquisition of BJ's machinery division which manufactures and sells certain drilling equipment used on oil and gas well drilling rigs. Of BJ's total 1973 sales of $57.5 million, its domestic machinery division sales amounted to $8.6 million.

## ISSUES

The issues involved in this action are framed by the language of section 7 of the Clayton Act which provides:

> "No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock . . . of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

This section requires the court to determine:

1. The relevant line or lines of commerce.

2. The relevant section of the country.

3. The effect such acquisition may have upon competition.

## LINE OF COMMERCE

In a Section 7 suit, it first becomes necessary to define line of commerce for purposes of evaluating the anticompetitive effect of the proposed acquisition. *United States v. Marine Bancorporation,* 418 U.S. 602, 618, 94 S.Ct. 2856, 2868, 41 L.Ed.2d 978, 989 (1974); *Brown Shoe Co. v. United States,* 370 U.S. 294, 324–25, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510, 535 (1962); *United States v. E. I. du Pont de Nemours & Co.,* 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057, 1066 (1957). Line of commerce has been defined to mean the "relevant product market," which in this case lies somewhere in the general area of products having to do with oil and gas well drilling and production. Such an operation requires many specialized tools, pieces of equipment, supplies and structures, each of which has its own individual function to perform, but all of which are necessary in the process. All of these products work together in a complementary and integrated fashion in order to accomplish the desired result. Each of the parties has selected a cluster of tools which it urges upon the court as the appropriate product market.

The government proposed a product market consisting of a cluster of some sixteen products which it designates as "oil field pipe-handling tools." These tools, the government contends, are designed, manufactured and sold for use in the oil and gas industry for connecting and disconnecting lengths of drill pipe, casing or tubing during the drilling and completion of an oil or gas well.[2] The government further contends that the sixteen individual tools and two combinations thereof[3] constitute separate submarkets, each of which is a relevant line of commerce in which the anticompetitive effect of the acquisition should also be measured.

The defendants' position is that the government has failed to establish a true,

hoes, and precision helicopter transmission gears.

**2.** The government's product market is comprised of power slips, manual slips, hooks, links, power tongs, manual tongs, tong dies, elevators, spiders, inserts, power spinning wrenches, semiautomatic pipe handling systems, hydraulic make and brake devices, kelly spinners, clamps and spinning chains.

**3.** In addition to the sixteen individual tools, the government contends that the combination of elevators and elevator spiders, since they possess design similarities, and the combination of manual tongs and power tongs, since they perform a similar function, also constitute submarkets.

relevant product market, and propose as their own a cluster of some thirty-six products which they designate as "specialized surface rotary drilling products" used in the handling of pipe and in the drilling, completion, production, and working over of oil and gas wells.[4]

In determining a relevant line of commerce, there is ample authority for the acceptance of a "cluster of products" as a reasonable and appropriate product market. See United States v. Phillipsburg National Bank & Trust Co., 399 U.S. 350, 360, 90 S.Ct. 2035, 2041, 26 L.Ed.2d 658, 670 (1970); United States v. Philadelphia National Bank, 374 U.S. 321, 356, 83 S.Ct. 1715, 1737, 10 L.Ed.2d 915, 940 (1963).

 The parties are in general agreement as to the tests to be applied by the court in determining the relevant product market. These tests are drawn from economic principles, and no one test is usually dispositive but each may be given different weight depending on its applicability to the facts. The tests used by this court to define the relevant product market include cross-elasticity of demand, United States v. Continental Can Co., 378 U.S. 441, 449, 84 S.Ct. 1738, 1743, 12 L.Ed.2d 953, 959 (1964), cross-elasticity of supply, Twin City Sportservice, Inc. v. Charles O. Finley & Co., 512 F.2d 1264, 1271 (9th Cir. 1975), industry usage and recognition, Reynolds Metal Co. v. FTC, 114 U.S.App.D.C. 2, 4, 309 F.2d 223, 226–29 (1962), complementarity of function, and functional integration.[5]

 Complementarity of function is an important test to use when determining the appropriate cluster of products which constitutes the relevant product market. Conceptually, the test may be viewed as a semantical hybrid of the "end uses" language contained in United States v. Continental Can Co., supra, and the "cluster of products" language contained in United States v. Philadelphia National Bank, supra. The term "function" is analogous to the term "end uses" in that both represent the purpose that the involved products are to perform, and the term "complementarity" is analogous to the term "cluster of products" in that both represent those products that are required, subject to varying degrees of necessity, to perform the function or end use.[6]

In this case, all parties agree that the function to be considered is the task of handling pipe.[7] Once the relevant function is determined, the court must then determine the tools which operate as a group in the performance of that function. Applying this test, I hold that the defendants' market accurately identifies those tools utilized in the handling of pipe as viewed in the context of a drilling operation. The major problem with the government's product market definition is that it is underinclusive since it does not set forth all the tools necessary to perform the relevant function.

The other tests further support a finding that the defendants have defined the relevant product market. Within each cluster there is about the same degree of cross-elasticity of demand, which I consider to be low inasmuch as in both clusters there is relatively little substitutability of one product

---

4. The defendants' product market includes within its cluster all products claimed by the government and, in addition thereto, swivels, traveling blocks, crown blocks, draw works, stabbing boards, kellys, handling subs, lifting nipples and plugs, rotary tables, ratholes, mouseholes, tuggers, cranes, master bushings, kelly bushings, catheads, derricks or masts, traveling block guides, power pipe manipulators, and blowout preventors.

5. Although none of the parties cite any authority for the use of either of these last two tests, all parties extensively relied upon their application during the trial.

6. If a cluster excludes products that to some degree are required to complement the products contained in the cluster in order that the appropriate function can be performed, the cluster is underinclusive. Contrariwise, if a cluster includes products that are not necessary to the performance of the appropriate function, the cluster is overinclusive.

7. Indeed, the government's proposed cluster of products is designated as "oil field pipe-handling tools."

for another. In addition, the defendants' market has greater recognition in the industry than does that of the government. The government's market is identical to those products which BJ presently manufactures or intends to manufacture. This fact seems to be the only justification for its selection. I believe the evidence to be credible that the only time the term "oil field pipe-handling tools" was used prior to the institution of this action, the term was used by those affiliated with BJ and had reference only to the tools which BJ was producing. The evidence indicates that the term was otherwise unknown in the industry prior to the institution of this action. On the other hand, there has been some industry recognition for the defendants' grouping of tools used above ground, as compared with those used below ground. For instance, the industry never considered Hughes as an entrant in the above ground tool market although it is extensively involved in supplying below ground equipment. Furthermore, the 1972 Census of Manufacturers, a publication of the Department of Commerce, makes a distinction between surface and subsurface drilling tools.

I hold, therefore, that the defendants' product market, consisting of a cluster of specialized surface rotary drilling tools, is the relevant product market. There exists a high degree of functional complementarity and integration linking the products. There is a high degree of commonality in the technology and manufacturing processes involving the components of the market. All products are marketed through similar channels and to the same group of buyers, and this market has recognition in the industry.

## SUBMARKETS

In addition to a product market, a product submarket may also be a relevant line of commerce for purposes of section 7 of the Clayton Act. In *Brown Shoe Co. v. United States, supra,* the Supreme Court recognized the existence of submarkets and discussed their applicability to section 7:

> "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. (Citation omitted) The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors. Because § 7 of the Clayton Act prohibits any merger which may substantially lessen competition 'in *any* line of commerce,' it is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition." 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510, 535. (Emphasis the Court's) (Footnotes omitted)

As previously noted, the government has urged this court to consider each tool and two combinations of tools within the government's cluster as individual submarkets. Although all of the government's proposed submarkets satisfy some of the tests suggested by the Supreme Court in *Brown Shoe Co. v. United States, supra,* none represents a viable submarket against which to measure the anticompetitive effect of the merger.

Dr. Neil Jacoby, the defendants' expert economist, testified that one of several elements to be considered in determining the presence of a separate submarket was whether the proposed submarket has substantial sales.[8] Using annual sales of approximately $184 million for the defend-

8. Dr. Jacoby's testimony was merely a restatement of the requirement that a submarket must be "economically significant." *See Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523, 8 L.Ed.2d 510, 535 (1962).

ants' product line, Dr. Jacoby indicated by testimony that, as applied to the facts of this case, a submarket was probably economically significant if it had sales of somewhere between $2 million and $5 million.

Applying only the element of substantiality of sales, there would be but seven potential submarkets, each of which had 1974 annual sales [9] exceeding $2 million: power spinning wrenches, totaling approximately $2.2 million in sales; hooks, totaling approximately $3.0 million in sales; inserts, totaling approximately $3.5 million in sales; semiautomatic pipe handling systems, totaling approximately $6.5 million in sales; [10] elevators, including elevator spiders, totaling approximately $8.9 million in sales; manual slips, totaling approximately $9.3 million in sales; and tongs, including manual and power tongs, totaling approximately $17.2 million in sales.

Other factors, of course, must also be taken into account, and these indicate that a relevant submarket does not exist as to any of the government's eighteen proposed submarkets. Since buyers typically purchase an array of tools to equip an oil or gas drilling rig fully, and since no one tool generally has a substantial group of buyers who purchase that individual tool and nothing else, each tool is to some degree dependent upon the market comprised of those tools required to perform the function of handling pipe.

The production facilities, methods, and technology related to these products can

hardly be said to be unique. They are all manufactured in a job-shop operation (fabricated individually) using conventional machine shop equipment and conventional operating methods and techniques. There is no special technology applicable to one which is not applicable to all. Admittedly, a manufacturer of a given product develops in time a certain degree of proficiency, improved techniques, efficient choice of machinery and successful manufacturing methods with respect to the products which it manufactures, but any large heavy machinery manufacturer would have plant facilities, personnel and at least basic equipment to go into production on any of these products included in the potential submarkets within a relatively short period of time. Such a manufacturer, of course, would have to start with a basic product which, plaintiff asserts, would require some time to design and test. The evidence indicates, however, that there are very few patents in existence that would prevent a duplication of these products. Furthermore, there is little industry recognition of each tool as a distinct market.

I conclude, therefore, that the true relevant product market in which to consider the anticompetitive effect of this acquisition is a cluster of specialized surface rotary drilling products used in handling pipe and in the drilling completion, production, and workover of oil and gas wells. I further hold that there are no submarkets to be considered in this case.

9. If 1973 annual sales figures are used, there would be but five potential submarkets based on the substantiality of sales only: hooks, totaling approximately $2.2 million in sales; inserts, totaling approximately $2.5 million in sales; manual slips, totaling approximately $5.4 million in sales; elevators, including elevator spiders, totaling approximately $7.3 million in sales; and tongs, including manual and power tongs, totaling approximately $11.3 million in sales.

10. The total of $6.5 million of sales for semiautomatic pipe handling systems includes approximately $4 million in orders obtained by Western Gear. Dr. Jacoby testified that while normally orders are not included as sales, the

orders in this instance were so definite and carried such heavy cancellation penalties that he considered them sufficiently firm for inclusion as sales. The plaintiff objects to their inclusion, apparently on the basis that orders have not been included for other firms and that the inclusion of Western Gear orders would significantly affect the market share for BJ. However, these orders have been included here only for the purpose of determining the substantiality of the submarket. If they were eliminated, the total sales for semiautomatic pipe handling systems would be approximately $2.5 million, thus weakening the government's submarket argument at least with respect to economic significance.

## GEOGRAPHICAL MARKET

There is only slight disagreement among the parties as to the relevant geographical market. The government contends that the United States is the true market, whereas, the defendants contend that the world is the true market and that the United States constitutes a submarket. So far as this action is concerned the distinction has little relevance, and I therefore hold that the United States is the relevant geographical market within which the anticompetitive effect of the proposed acquisition will be considered.

## CHARACTERISTICS OF THE RELEVANT MARKET

*Competitiveness*

There are now and have been, at least for the last ten years, a substantial number of vendors competing in both the defendants' market and the government's market. During 1974 and 1975, there were some ninety-one American firms competing with respect to the sale of products in the defendants' market, and during the same period there were at least thirty-six American firms competing with respect to the products in the government's market.

Although complete sales figures are not available, those we do have indicate that during 1974 the concentration of the top four firms selling products in the defendants' market was 34% and the top eight firm concentration was 58%, with BJ's market share being less than 6%. In the restricted government's market, the concentration of firms during 1974, utilizing the same incomplete sales figures, was 51% for the top four firms and 77% for the top eight firms, with BJ's market share being 20%.

The evidence further shows that over the years, between 1970 and 1974, there has been a significant deconcentration trend in the government's market as to the shares of the top four firms, including BJ's. The top four firms' share of reported sales declined from 63% to 52%, and BJ's share declined from 29% to 20%. During that period industry sales exploded dramatically in large

part due to the energy crisis, yet BJ's sales materially declined relative to those of its largest competitors in both the defendants' market and the government's market. Although BJ's sales doubled over that five-year period, those of its largest competitors rose from 240% to almost 600% of their 1970 basis.

Based upon these figures and the other evidence in the record, I conclude that the relevant market, and even the government's proposed market, has been, is, and probably will continue to be competitive. Further, I conclude that the defendants' market was deconcentrated at the time of the proposed acquisition and is presently deconcentrated.

*Conditions of Entry Into The Market*

Conditions of entry in the relevant market, as well as in the market that the government proposed, are relatively easy in comparison with those in other American manufacturing industries. They can be met quickly and with less expenditure of capital and in less time than entry conditions in such industries as steel, automobiles, or petroleum refining. The technology is not complex, and, furthermore, personnel with the knowledge and experience to design, manufacture and sell products in the market are available and can be recruited. Patents pose no significant problem in the design of products in either market. Entry on the whole is made easier because economies of scale in production are relatively unimportant in this industry where most production is on a job-shop basis. Advertising is also a relatively insignificant factor in the sale of products in the defendants' or government's market. Similarly, the desirability of acquiring some reputation in the market does not pose an insurmountable entry barrier. Good reputation flows naturally from developing dependable, reliable products.

Barriers to the extension of product lines by firms already in the market are also relatively low. A firm manufacturing spiders or elevators, for example, can readily develop and market a tong or a swivel

because it has access to the required raw materials and possesses the necessary technology, machinery, manufacturing and market skills, and personnel. In both the defendants' market and the government's market there has been substantial entry and exit rates in firms and products, indicating that entrance is relatively easy and that healthy competition is present within both markets.

*Numerous Financially Strong and Sophisticated Buyers*

Buyers of surface rotary drilling products are numerous, financially strong, and technically sophisticated. Included among the top twenty-five ultimate users of BJ's products in 1974 are a number of corporations having average total assets of $227 million and average 1974 gross revenues of $344 million. Buyers who make the ultimate purchasing decisions for these companies are engineers or have engineering staffs who evaluate products on their merit and are not vulnerable to any market power or advertising by the seller. Purchasing decisions are based upon the opinions of experts who, after careful analysis, determine which of the available tools will do the best job. This factor strengthens competition for it offsets the effect of any market power other than that which a seller might have acquired on the basis of product quality.

*Growth of Demand for The Product*

Since 1972, the demand for surface rotary drilling equipment, including the narrower range of products in the government's market, has risen consistently and at an accelerated rate. The rise began as a result of the increasing price of crude oil which was caused by the price increases imposed by the OPEC countries in 1973 and again in 1974, and the embargo placed on supplies coming into the United States. These factors caused a rapid increase in the demand for domestic oil and, hence, for the products used in the drilling for such oil. This increased demand should persist for at least five to ten years and will undoubtedly pro-

vide strong incentives for others to enter the market, which should result in even more intense competition. A relatively large backlog of orders and long delivery lead times now exist which indicates an attractive market for new competitors.

The competitiveness of the market is further demonstrated by the rapid pace of technological progress and product innovation. Three broad technological thrusts are in motion in the industry. One is the application of power to tools and equipment, such as power tongs, power slips, and power spinning wrenches. The second is the integration of small components into larger elements which are more efficient, such as torque elevators and elevator spiders. The third is the replacement of manual controls by electronic computerized controls. In addition to these, a revolutionary drilling rig utilizing concepts entirely new to the industry has been designed and is presently being tested.

Summing up these indicia of competitiveness, the relevant market, as well as the narrower market proposed by the government, has been shown to be competitive and such competition has been increasing. No company has the capacity to determine price or the output of goods or services. In a manner consistent with the presence of normal competition, BJ reviews and changes its prices periodically in light of economic conditions and its costs. Competition exists with respect to quality, services and product innovation as well as prices. The survival of new entrants in the 1964–75 period shows that neither BJ nor others in the market possess any power to exclude competitors. Furthermore, the relevant market has not been substantially concentrated nor is it likely to become so as a result of the merger.

ABSENCE OF MARKET ENTRENCHMENT

The government contends that the merger will further entrench BJ in its market position, but the evidence does not support this contention. The acquisition of BJ by Hughes is a conglomerate merger rather

than a horizontal or vertical merger. Since BJ and Hughes operate in separate and distinct markets, the acquisition will not increase the concentration in any market or in any of BJ's share of such market. There is no showing that Hughes' manufacturing know-how and capabilities will materially aid BJ in its production. BJ is basically a job-shop operation in which a few products are made at a time, whereas, Hughes' manufacturing operation is production-line oriented in which large lots of bits and tool joints are made in a procession of operations. The tooling used by Hughes and its plant layout are different, and the level of skill of the machinists employed by Hughes is significantly lower than that required of the machinists employed by BJ. Since the production lines differ radically, there are no potential economies of scale, and neither Hughes nor BJ currently has any excess manufacturing capacity. There is no persuasive evidence that Hughes' research, development and engineering capabilities can or will be used by BJ to its advantage.

There is no indication that BJ's marketing capabilities will be improved to any substantial degree by the merger. The marketing channels and facilities of the two companies are quite different with respect to the technical training of the sales forces and the buyers with whom they deal and who make the ultimate purchasing decisions. The times and places of the respective sales of the two companies are also different. Nor does the evidence show that BJ will receive any competitive advantage by reason of Hughes' advertising and sales promotion. Advertising plays only a very minor role in the sale of products in this industry for these buyers are sophisticated, trained and informed and are not swayed by advertising or sales promotion campaigns.

There is no basis for the government's contention that the high reputation which Hughes enjoys will give BJ any measureable or significant competitive advantage. BJ, already well established in the industry, has its own reputation which is excellent. The combination of these two reputable firms will undoubtedly increase the stature of both in the industry. But since those making purchasing decisions are sophisticated buyers, there is little likelihood that the mere addition of Hughes' reputation to a BJ product will be at all persuasive. The government has not carried its burden of proof on its claim that the merger would result in BJ's market entrenchment.

## POTENTIAL COMPETITOR

■ The government has contended that the merger has an anticompetitive effect upon the relevant lines of commerce because it eliminates Hughes as a potential competitor, either perceived or actual, or both. This argument has relevance only when dealing with concentrated markets. Having held that the relevant market here is not highly concentrated and is freely competitive, this is not the occasion to apply either doctrine of potential competition.

■ But even if this court were to conclude that the market conditions were such that the relevant market could have benefited from the existence of a perceived potential entrant, the burden rests upon the government to prove that Hughes "was so positioned on the edge of the market that it exerted a beneficial influence on competitive conditions in [the relevant] market." *United States v. Falstaff Corp.*, 410 U.S. 526, 532–33, 93 S.Ct. 1096, 1100, 35 L.Ed.2d 475, 481 (1973). This the government has failed to do.

The Supreme Court extensively discussed the doctrine of perceived potential competition in *United States v. Falstaff Corp., supra.* The Court held that where a company is perceived by other companies already in the market as becoming a competitor if market conditions appear favorable, the new entrant should not be allowed to enter the market other than by de novo entry or a toe-hold acquisition. 410 U.S. 526, 533–37, 93 S.Ct. 1096, 1101, 35 L.Ed.2d 475, 481. In restricting entry to these avenues, the present competitive effect of the potential entrant is maintained.

The record is devoid of evidence that Hughes exerted a pro-competitive effect on

the relevant market either at the time of acquisition or at the time of trial. There is no evidence that other companies perceived Hughes as a potential entrant. Indeed, all the evidence is to the contrary. Further, there were a number of companies other than Hughes that were likely entrants into the market. At least six substantial companies responding to the court-ordered questionnaire possessed all the basic capabilities for entrance, and three other substantial companies possess several of the basic prerequisites for entry.

Turning to the determination of whether Hughes was an actual potential entrant, there is no evidence that Hughes had the desire or the intention to enter the market de novo or by way of a toe-hold acquisition. Hughes' activities, capabilities, interests, business methods and background were in a different direction and it had no financial incentive or interest in such an entry.

Viewing the evidence as a whole, I hold that Hughes was not perceived as a potential entrant into the relevant market or the government's proposed narrower market. I further hold that its presence outside the market did not influence the business behavior of the participants within it. Finally, I find that Hughes was not an actual potential de novo or toe-hold entrant into the market, including that market claimed by the government.

### CONCLUSION

Since the government has failed to carry its burden of proof and provide sufficient evidence that the effect of Hughes' acquisition of BJ from Borg-Warner may be substantially to lessen competition in a relevant line of commerce in the United States or to tend to create a monopoly in violation of section 7 of the Clayton Act, judgment must be for the defendants.