**FEDERAL TRADE COMMISSION,**
**Petitioner,**

v.

**TENNECO, INC. and Monroe Auto**
**Equipment Company, Respondents.**

**Civ. A. No. 77–0448.**

United States District Court,
District of Columbia.

May 23, 1977.

D. Barry Morris, F. T. C., Washington, D. C., for petitioner.

John L. Jeffers, Jr., Baker & Botts, Houston, Tex., David C. Murchison, Howrey & Simon, Washington, D. C., for respondents.

MEMORANDUM OPINION

PARKER, District Judge:

In this proceeding the Federal Trade Commission (FTC or Commission) seeks a preliminary injunction pursuant to Section 13(b) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 53(b) (Supp. V 1975). The Commission requests the Court to enjoin Tenneco, Inc. (Tenneco) from completing steps to acquire the Monroe Auto Equipment Company (Monroe) and to maintain the status quo during the pendency of administrative proceedings which the Commission has commenced against the two respondents. The Court has considered the parties' memoranda of points and authori-

ties, supporting affidavits, the relevant portions of the depositions of various witnesses and the oral arguments of counsel.

Essentially, this litigation concerns a challenge to a proposed diversification acquisition involving two corporations. The Commission contends and the respondents deny that but for the proposed merger, the corporations are or would be competitors. The Court finds that no actual competition exists and that while there is the possibility of potential competition, the petitioner has failed to demonstrate sufficiently that there is a reasonable probability that it will prevail at a trial on the merits. In accordance with Rule 52 of the Federal Rules of Civil Procedure, the Court enters findings of fact and conclusions of law and determines that the application for a preliminary injunction should be denied.

## FINDINGS OF FACT

### The Background

The Federal Trade Commission is an agency of the United States Government charged by law with, *inter alia,* the enforcement of the Federal Trade Commission Act, 15 U.S.C. § 41 *et seq.,* and the Clayton Act, 15 U.S.C. § 12 *et seq.* Tenneco, a Delaware corporation with its principal place of business in Houston, Texas, resides and transacts business in the District of Columbia. Monroe, a Michigan corporation whose principal place of business is Monroe, Michigan, also transacts business within the District. The respondents are engaged in "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and in Section 1 of the Clayton Act, 15 U.S.C. § 12.

In January, 1976, the chief executive officer of Monroe informed the president of Tenneco's Walker Manufacturing Division (Walker) that Monroe was interested in being acquired by Tenneco. Monroe's interest in the acquisition was represented to be economic in nature and prompted by a decline in its profits and by the desire of its principal stockholders to obtain greater investment security. Walker's management

was receptive and the parties entered into merger negotiations with the understanding that Tenneco's approval would be required. In December, 1976, the companies jointly announced a preliminary agreement whereby Tenneco would seek to acquire, pursuant to an exchange offer, at least 80% of Monroe's shares. If successful, the exchange offer would be followed by a merger of Monroe into a subsidiary of Tenneco. In February, 1977, Tenneco filed with the Securities and Exchange Commission its registration statement concerning the shares of its common stock that it intended to offer in exchange for the shares of Monroe. In March, 1977, the FTC sought Section 13(b) injunctive relief in this Court, and at an initial hearing, counsel for Tenneco and Monroe stipulated that the companies would suspend further merger efforts pending a hearing and ruling on the application for a preliminary injunction.

Section 13(b) is a recent statutory enactment.[1] It authorizes the Commission to seek injunctive relief when it has reason to believe that a planned acquisition violates the laws which it enforces. The injunction is designed to maintain the status quo and to protect the public interest. Thus, the Commission would not be required at a later date to initiate divestiture proceedings. Once the Commission is advised that an acquisition may be impermissible under law, an investigation is launched. The investigation in turn may lead to the issuance of a formal complaint by the Commission.

The FTC issued an administrative complaint against the respondents on March 15, 1977, and charged that:

The effects of the steps taken by Tenneco to acquire Monroe constitute an unfair method of competition in or affecting commerce in violation of Section 5 of the Federal Trade Commission Act, . . . and the proposed acquisition by Tenneco of Monroe, if consummated, may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, . . . and constitute an unfair act and practice in or

1. Nov. 16, 1973, Pub.L. No. 93–153, 87 Stat. 592.

affecting commerce, in violation of Section 5 of the Federal Trade Commission Act . . . .[2]

On that same date, it filed a complaint with this Court "[to] enjoin . . . consummation of the acquisition and [to] preserve . . . Monroe as a viable and independent entity until the complaint . . . is dismissed by the Commission or set aside by the Court on review, or until the order of the Commission made thereon has become final." Argument on the motion for preliminary injunction was concluded on May 6, 1977.

The relevant language of Section 13(b), which is a general grant of authority, provides in part:

Whenever the Commission has reason to believe—

(1) that any . . . corporation is violating, or is about to violate, any provision of law enforced by the . . . Commission, and

(2) that the enjoining thereof . . . would be in the interest of the public— the Commission . . . may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, . . . a preliminary injunction may be granted . . . .

15 U.S.C. § 53(b).

The petitioner seeks to halt the proposed acquisition on the basis of this statutory language.

## The Companies

### Tenneco

Tenneco is a multi-business concern. Walker, a division of Tenneco, is a leading manufacturer and distributor of exhaust system parts both to the domestic replacement market and to its submarket, the independent aftermarket.[3] In 1976, Walker accounted for approximately 36% of ship-

ments to the replacement market and 39% to the independent aftermarket. Walker also purchases shock absorbers from Monroe which it resells to its customers. In 1976, these sales amounted to $283,000, accounting for approximately $1/10$ of one percent of shipments to the shock absorber replacement market, a market it did not enter until October, 1974.

A Tenneco subsidiary, Mechanex, sells a product called a steering damper. There is sharp dispute between the parties as to whether or not this device is a traditional shock absorber for antitrust purposes. Mechanex does not manufacture the steering damper, however. It purchases its requirements from the Gabriel Division of Maremont Corporation (Gabriel).

### Monroe

Monroe is a leading manufacturer and distributor of shock absorbers in the United States and worldwide. The company offers the most complete coverage of truck and bus shock absorbers and produces and sells shock absorbers for use on virtually all domestic and many foreign makes and models of automobiles. In 1976, it ranked second in domestic sales of shock absorbers to the replacement market. It is the largest seller of shock absorbers to warehouse distributors, selling to approximately 750 of the nation's 1,000 distributors, who in turn sell to jobbers for their resale to consumers, service stations, garages and other retail outlets. Measured in units, Monroe accounted for some 32% of the domestic shipment of shock absorbers to the replacement market in the one-year period ending June 30, 1976. Additionally, in the first six months of 1976, Monroe shipped approximately 6.1 million shock absorber units to the wholesale channel and 4.0 million units to the retail channel, giving it a 43.3% share of industry shipments to the former and a 24.5% share to the latter. The company operates three major domestic production facilities located in Nebraska, Georgia and

---

**2.** Administrative Complaint Before the Federal Trade Commission, ¶ 53.

**3.** A discussion of product markets is set forth *infra* at pp. 110–111.

Arkansas. Together with Monroe's corporate headquarters, these facilities also function as distribution points for Monroe's independent aftermarket customers.

### The Issues Presented

The Commission contends, in the language of the Clayton Act, that Monroe's acquisition by Tenneco "may . . . substantially . . . lessen competition, or . . . tend to create a monopoly." 15 U.S.C. § 18. To support its position, a three-pronged argument is advanced: (1) that there is actual competition between Walker and Monroe; (2) that each company is an actual potential competitor in the other's relevant field of commerce; and (3) that each is perceived by the other's industry as being a potential competitor. The Commission's actual competition allegation is based upon the assumption that shock absorbers and steering dampers serve the same purposes and are virtually equivalent for antitrust purposes. Petitioner also asserts that, through Walker, Tenneco manufactures and sells shock absorbers and that, through Mechanex, it manufactures and sells steering dampers. Finally, it notes that in 1976 Walker sold some $283,000 worth of shock absorbers, that Mechanex sold approximately $531,000 of steering dampers, and that such amounts represented .3% of the shock absorber market. The combination of these factors, it is argued, makes a strong case of Clayton Act § 7 violation since the slightest market accretions by way of horizontal merger are significant when the market is so highly concentrated. *United States v. ALCOA*, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964).

The Commission's actual potential competition allegation is premised upon the belief that Walker and Monroe could have successfully influenced and diluted the replacement markets for shock absorbers and exhaust system parts if each had entered the other's market in a proper fashion (entry effect theory). A proper fashion, according to petitioner, consists of either internal expansion (*de novo* entry) or the acquisition of a small competitor (a toehold). Because of significant similarities in the marketing and manufacturing of shock absorbers and exhaust system parts, it is argued, Monroe and Walker would have entered each other's markets *de novo* or through the acquisition of a small manufacturer if the proposed merger had not developed. By so acting, each corporation could have added a competitive force to the other's market without eliminating one already present. *United States v. Phillips Petroleum Co.*, 367 F.Supp. 1226, 1232 (C.D.Cal., 1973), *aff'd mem.*, 418 U.S. 906, 94 S.Ct. 3199, 41 L.Ed.2d 1154 (1974).

The perceived potential competition allegation is based upon the assertion that each respondent is poised at the edge of the other's field of commerce, threatening to enter if market conditions become sufficiently favorable (edge effect theory). This situation, it is stressed, results in a favorable effect upon competition in the subject market since the competitors within will act in a manner beneficial to the consuming public. *Id.* at 1232–33. Thus, the Commission argues that the proposed acquisition will constitute a Section 7 violation if it can be proved that Walker and Monroe each (1) had the characteristics, capabilities, and economic incentives to render it a perceived potential *de novo* entrant, and (2) in fact tempered the oligopolistic behavior of those already in the market. *United States v. Marine Bancorporation*, 418 U.S. 602, 624–25, 94 S.Ct. 2856, 41 L.Ed.2d 978 (1974).

Overarching these potential competition allegations is the requirement that the relevant market be highly concentrated. In addition, before the Court can consider the Commission's entry effect proposition, two preconditions must be found to exist: (1) that Walker and Monroe each have available means of admission to the other's market other than the proposed merger, and (2) that those means offer a substantial likelihood of eventually producing a deconcentration of the target market or "other significant procompetitive effects." *Id.* at 633, 94 S.Ct. 2856.

Finally, despite the fact that it seeks extraordinary relief, petitioner argues for a less strict standard than that outlined by this Circuit in *Virginia Petroleum Jobbers Ass'n v. FPC,* 104 U.S.App.D.C. 106, 259 F.2d 921 (1958). In a post-hearing memorandum, petitioner contends that "[w]here . . . as in the instant proceeding a strong showing of 'public interest' has been made the showing required for likelihood of [ultimate] success is even less, requiring only 'that there be a fair chance of success on the merits.'"[4]

Respondents' position is (1) that no actual competition exists between Walker and Monroe in shock absorbers because (a) steering dampers and traditional shock absorbers are not part of the same product market, and (b) because Walker and Mechanex do not produce but merely purchase and resell these products; (2) that despite figures indicating high concentration in the exhaust system parts and shock absorber replacement markets, the markets are competitive; and (3) that the entry and edge effect theories are not applicable to competitive markets and, in this case, would not otherwise be applicable. In addition, Walker and Monroe argue that the substantial probability test should govern this proceeding, not a lesser standard.

As to the first point, respondents assert by affidavit that steering dampers and shock absorbers serve different, non-interchangeable functions and that Walker and Monroe do not manufacture the products in question. In support of their second point, respondents marshal evidence to counter the assumption that the unusually high concentration figures presented by petitioner indicate a less-than-fully-competitive state in the respondents' industries. As to the last point, respondents correctly note that the entry effect doctrine has never been sanctioned by the Supreme Court and tends to be self-contradictory.[5] In addition, they argue that the respective markets are hostile to the development of toeholds and that any existing manufacturing or sales similarities between Walker and Monroe are shared by other corporations and are not sufficient to form a basis for *de novo* entry. The edge effect theory, they claim, would also be difficult to prove here since (1) it has rarely, if ever, been applied to product extension mergers, and (2) petitioner cannot demonstrate that either Tenneco (Walker) or Monroe exercises a "disciplining effect" on the other's market.

Finally, Walker and Monroe observe that while this Circuit may not have adopted a standard to be applied in these circumstances, the Fourth Circuit in *FTC v. Atlantic Richfield Co.,* 549 F.2d 289 (4th Cir. 1977) has declared the substantial probability test to be the governing standard there. Assuming the legal predicates of high concentration and of high barriers to entry can be established here, it is this standard which respondents would have the Court adopt.

### The Products, the Markets and Barriers to Entry

Before considering the merits of petitioner's arguments, the Court must define the relevant geographic and product markets and determine whether high concentration and significant barriers to entry into the relevant fields of commerce exist. The definitional tasks are undertaken to ascertain the relevant geographic area and lines of commerce. The concentration and barriers issues must be determined because admission to a competitive and easily entered market is not problematical and does not provide a forum in which corporations will

---

**4.** Petitioner's Memorandum Concerning Standard for "Likelihood of Ultimate Success" in Section 13(b), filed May 11, 1977, at 4.

**5.** Respondents argue that the theory is self-contradictory because as a prerequisite, one must prove that the market is highly concentrated and controlled by a small number of oligopolists which have certain advantages that frustrate ease of entry by outsiders. These advantages might include patents, brand name identification, trade secrets, or long-term contracts that small competitors and especially noncompetitors do not enjoy and perhaps could never achieve. Thus, it would be difficult, if not impossible, for a toehold or *de novo* entry by an outsider to threaten entrenched existing firms.

have "occasion to fashion their behavior to take into account the presence of a potential entrant." *United States v. Marine Bancorporation,* 418 U.S. at 630, 94 S.Ct. at 2874.

### The Products

Exhaust systems consist of mufflers and connected piping that serve to dissipate the engine fumes of a vehicle as well as to reduce the noise level arising from its operation. The muffler is a series of tubes housed in a metal unit with adaptations. Pipes leading from the engine to the muffler and tailpipe complete the system. Although estimates vary depending upon the existing resources of a corporation, the cost of constructing and outfitting a plant to produce a full line of exhaust system parts is substantial. At present, there are five principal manufacturers in the replacement field: Walker, Maremont Corporation (Maremont), Questor Corporation (Questor), Midas International Corporation (Midas), and Arvin Industries, Inc. (Arvin).

Shock absorbers are hydraulic devices which consist of a pump-like mechanism housed within two concentric cylinders. The cylinders are partially filled with a fluid such as oil. The ends of the mechanism are attached to the chassis and to each wheel of the vehicle so as to compress the fluid and to limit or control the automobile's vertical movement. Shock absorbers contribute to the stability, comfort, and roadability of a vehicle.

Steering dampers are a form of shock absorber. These mechanisms, however, are employed to reduce the lateral movement of an automobile's wheels and are utilized on a limited number of vehicles.[6] Although they are similar in technological design, steering dampers and the more traditional shock absorbers are not interchangeable.

### The Geographic and Product Markets

It is uncontroverted that the relevant geographic market is the United States of America. Throughout this area, both shock absorbers and exhaust system parts are sold for installation as original equipment in new vehicles (original equipment market) and for the replacement of worn out or damaged units on existing vehicles (replacement market). The distinction between these two markets has been recognized by the industry and is supported by demonstrated market realities. Further, the replacement market for shock absorbers and exhaust system parts consist of two submarkets: the service market and the independent aftermarket. The former consists of sales made to vehicle producers for service sales to their dealers, while the latter encompasses all other replacement sales except those made to other manufacturers of the same product.

Concentration in the sale of shock absorbers to both the replacement market and the independent aftermarket is high. The four-firm concentration in 1976 sales of shock absorbers was in excess of 83% to both the replacement market and the independent aftermarket. Concentration in the sale of exhaust system parts is equally high. According to respondent Tenneco's (Walker's) own statistics, two firms accounted for approximately 57% of sales to the replacement market in 1975 and four firms were responsible for some 88%. When the top five firms are considered for that year, the approximate share of the market reaches 96%.

Traditionally, both the shock absorber and exhaust system parts businesses have been profitable and stable. The market positions of the top five replacement exhaust system parts producers have not changed significantly for over ten years. The shock absorber replacement market has been likewise traditionally stable. While Monroe has, in the last two years, experienced a decline in profitability, the respondents view the drop as temporary and attributable to a variety of factors, only one of which is the increased competition from its principal competitor, Maremont's Gabriel

---

6. Steering dampers are used principally on certain trucks, imported automobiles and front wheel drive vehicles such as the Oldsmobile

Toronado. Nelson affidavit at 10; Petitioner's Exhibit 14B.

shock absorber division. In addition, the evidence demonstrates that a large part of the competition experienced in the field is of a nature which is not likely to produce price competition. According to a report prepared by Tenneco in contemplation of the proposed merger, Monroe has been "careless" in its pricing.[7] Only in the case of the large purchasers is there credible evidence that buyers may exert respectable influence on prices.

*Barriers to Entry*

Barriers to entry into the replacement shock absorber market and, in particular, into the independent aftermarket are high. Such barriers include a high absolute cost to enter *de novo*; the large size required for an efficient plant; and a high degree of product differentiation which is encouraged by heavy advertising and promotional activities.

An analogous situation exists in the replacement exhaust system parts market. Among the more significant barriers are the high cost of *de novo* entry; the large size of an efficient plant; the importance of extensive economies of scale; and the use of patents to secure cross-licensing agreements.

Finally, despite these high barriers, it appears that because of traditionally high profits and of the expanding nature of the market,[8] the shock absorber field is becoming more attractive to potential entrants and minor participants. The Court does not find that because significant barriers exist, attempts to penetrate this market will not be made.[9]

### Tenneco's Interest in Shock Absorbers as a Compatible Product Line for Exhaust System Parts

Tenneco has, over the last ten years, exhibited significant interest in the shock absorber field on at least three different occasions. As early as 1967, Tenneco, through Walker, entered into discussions with Armstrong Equipment Ltd. (Armstrong) concerning entry into the U.S. replacement shock absorber market. As discussions progressed, Armstrong, a large British corporation, proposed to supply through a subsidiary shock absorbers to Walker for sale in the United States.[10] Armstrong declined to permit Walker to market all of its line, however, because it felt it could "build . . . [its] U. S. market into a reasonable [sic] substantial one and . . . [it] want[ed] the shock absorber base to work from." [11] In 1973, Walker considered acquiring Tropic Industries, a company that produced the "Loadamatic self adjusting shock absorber." Although Walker subsequently declined to pursue the negotiations for business purposes, the prospective merger was initially viewed in a favorable light. In addition, in May, 1974, Walker expressed an interest in Triple S Industries (Triple S), an assembler of steering dampers.[12] In particular, interest was focused upon Triple S's Terramatic shock absorber which, at

---

7. Petitioner's Exhibit 80K.

8. Some of the factors said to contribute to this market expansion are (1) that owners are retaining their vehicles for longer periods of time and (2) that buyer preference may be moving toward smaller automobiles where "the degradation in the quality of the ride is more noticeable" than in full sized autos. Petitioner's Exhibit 3I. On the issue of market expansion generally, *see* Petitioner's Exhibits 8R, 80D, F, and M.

9. The significance of this point lies in the fact that where an alleged potential entrant is but one of a number of firms in a similar posture, the loss of one potential entrant is not significant and should not render an acquisition unlawful. *United States v. Hughes Tool Co.,* 415

F.Supp. 637 (C.D.Cal.1976); *Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d 851, 865 n. 30 (2d Cir. 1974); *United States v. Black and Decker Manufacturing Co.,* 430 F.Supp. 729, 743 n. 23 (D.Md.1976) and cases cited therein.

10. Petitioner's Exhibit 67.

11. Petitioner's Exhibit 69.

12. The petitioner, through the affidavit of its economist, Dr. Steven R. Nelson, refers to Triple S as a "manufacturer" of steering dampers. Nelson Affidavit at 33. Petitioner's Exhibit 47, however, indicates that Gabriel produces the equipment and that Triple S merely tailors it to its needs.

that time, Walker believed might be a substantial innovation.[13] Motivated in part by this innovation, Walker acquired the assets of Triple S in 1974. Finally, in early 1976, Walker negotiated for the acquisition of De Carbon Shock Absorber Company (De Carbon), one of the major shock absorber manufacturers in France. Tenneco's interest in the shock absorber industry remains strong.

The reason for Tenneco's sustained interest lies in the fact that in certain areas shock absorbers and exhaust system parts are reasonably compatible. This point has been repeatedly noted by Tenneco in its inter-office memoranda and communications. This compatibility arises from commonalities in marketing channels and methods as well as from certain similarities in manufacturing methods. Walker and Monroe share many of the same customers and prospective customers, and Walker has been contemplating the creation of a single distribution system for both shock absorbers and exhaust system parts. In addition, both businesses use the pipe or tube mill as a principal production unit and employ drawing, swedging, welding, and stamping operations in the manufacturing process.

This is not to say, however, that the two products do not have significant dissimilarities. Advertising, for instance, appears to be much more important in the shock absorber business because of the need to draw the customers' attention to both the product and the need for replacement. This point has effects on marketing approaches. For example, two of respondents' competitors, Maremont and Questor, have not been able to utilize a combined sales force despite the fact that both make shock absorbers and

exhaust system parts. Finally, it appears that Walker possesses only some of the expertise needed to manufacture shock absorbers, and the evidence is virtually undisputed that Walker's manufacturing facilities, as presently constituted, could not be used for the production of shock absorbers.

### *Likely Potential Entrants into Shock Absorber and Exhaust System Parts Manufacturing*

*Tenneco*

Because of the nature of shock absorbers and exhaust system parts, Tenneco's large size, plentiful resources, and demonstrated interest in shock absorber manufacturers, Tenneco must be considered a likely entrant into the field. The Court cannot find, however, (1) that Tenneco is likely to enter the shock absorber field by either toehold acquisition or internal expansion, or (2) that only a few likely entrants exist.

A toehold may be defined as (1) a small, available corporation [14] with (2) the relevant technical expertise [15] (3) which is not dominant or otherwise significant in the American or foreign market [16] and which (4) has a reasonable likelihood of serving as a viable market entry vehicle.[17] Armstrong and De Carbon are large corporations which have substantial market positions in their respective home markets, and Triple S's Terramatic does not appear to be a likely base for substantial growth. In addition, shock absorbers and exhaust systems are not so compatible that a corporation may easily move from one to the other.

Finally, respondents have argued that there are numerous equally likely potential entrants,[18] namely, (1) the automobile and

---

**13.** Subsequently, the Terramatic proved to be less important. At the time Tenneco purchased a license to it, no value was assigned to the license, and because much of the invention has been covered by patent in prior art, little has been undertaken to bring it into production.

**14.** *United States v. Marine Bancorporation,* 418 U.S. at 625, 94 S.Ct. 2856; *United States v. Black and Decker Manufacturing Co.,* 430 F.Supp. at 766.

**15.** *United States v. Black and Decker Manufacturing Co.,* 430 F.Supp. at 766.

**16.** *Missouri Portland Cement Co. v. Cargill, Inc.,* 498 F.2d at 864.

**17.** *Id.*

**18.** Much is made by the Commission of the deposition testimony of Byron Pond, senior vice president of Maremont, to the effect that Tenneco is a likely entrant and, as such, it has influenced his company's behavior. The Court

truck manufacturers; (2) the foreign shock absorber manufacturers; and (3) other auto parts producers. While the deposition testimony indicates that many of the proposed rivals are, in fact, already in the market on a limited scale and/or, like Tenneco, possess only some of the abilities necessary for entry, the Court is not convinced that only a few probable entrants exist.

### Monroe

Many of the same factors which lead the Court to conclude that Tenneco is a likely entrant by acquisition into the shock absorber replacement field argue for Monroe's entry into exhaust systems. Since 1972, Monroe has been interested in products with "good potential in the aftermarket which would be fitted into our marketing structure."[19] In addition, Monroe has attempted to acquire Arvin, the smallest of the five largest replacement exhaust system parts suppliers. As with shock absorbers, however, petitioner has not sufficiently proved its case. Because of Arvin's fifth place rank in and its 8% share of the exhaust system parts market, it is of questionable value as a toehold.[20] Although no clear judicial guidelines as to size have been formulated, in *United States v. Phillips Petroleum Co.*, 367 F.Supp. at 1258, the court held that a company ranking seventh with a 6–7% share in a concentrated market would not constitute a toehold. In addition, Monroe does not have the financial resources of Tenneco, a factor which, along with other high barriers to entry, would make it particularly difficult for Monroe to enter *de novo*. Finally, it appears that more than a few likely entrants exist.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) and 28 U.S.C. §§ 1337 and 1345.

2. Venue is proper pursuant to Section 13(b) of the FTC Act and 28 U.S.C. § 1391(c).

3. Before an injunction can be issued, petitioner must demonstrate a reasonable probability that it will ultimately prevail on the merits. Additionally, since a regulatory statute is involved, the public interest is of heightened significance and must be given careful consideration.

4. The relevant shock absorber and steering damper markets are highly concentrated and suitable, in this respect, for application of the potential competition doctrines.

5. The relevant geographic market is the United States of America.

6. The product markets consist of the manufacture and domestic sale of (1) shock absorbers to the replacement market; (2) shock absorbers to the independent aftermarket; (3) exhaust system parts to the replacement market; and (4) exhaust system parts to the independent aftermarket.

### Actual Competition

7. Steering dampers and shock absorbers are different products and are not in competition with each other. "The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1524, 8 L.Ed.2d 510 (1962). Since steering dampers address horizontal movement on a vehicle while shock absorbers concern vertical motion, the products serve different purposes, and cannot be substituted one for the other.

8. Tenneco, through Walker and Mechanex respectively, merely purchases tradiational shock absorbers and steering dampers

---

notes that his testimony concerns only Maremont's response to its fears of likely entrants in general. Mr. Pond stated only that efforts were made to exclude competitors because "the profitability that Monroe has demonstrated . . . signal[s] a real opportunity for

*anyone* to enter the shock absorber business." Pond deposition at 28 (emphasis added).

**19.** Petitioner's Exhibit 19E.

**20.** Petitioner's Exhibit 4–O.

for resale to a limited number of customers. Tenneco cannot, therefore, be considered to be in competition with the manufacturers of these products.[21]

*Actual Potential Competition*

9. Petitioner has not sufficiently demonstrated the existence of toeholds which Monroe and Tenneco, through its Walker division, could use to enter successfully the exhaust system parts and shock absorber markets respectively.

10. Petitioner has not sufficiently demonstrated that, from a practical viewpoint, Walker or Monroe would or could successfully enter each other's markets by internal expansion.

11. Petitioner has failed to satisfy the two preconditions of the actual potential competition theory: (1) that, in fact, Walker and Monroe each has available means for entering the other's market other than through the challenged acquisition, and (2) that those means offer a substantial likelihood of eventually producing a deconcentration of the target market or "other significant procompetitive effects." *United States v. Marine Bancorporation,* 418 U.S. at 633, 94 S.Ct. 2856. The evidence is inconclusive as to the first of these two points, and little or no support has been submitted in behalf of the second.

*Perceived Potential Competition*

12. Petitioner has not met the requirements of the perceived potential competition theory. In light of the fact that Walker and Monroe are not in the same line of commerce, the evidence as to the ability and incentive of either to enter the other's field is inconclusive.[22] In addition, the evidence is inconclusive as to whether Walker or Monroe is actually perceived by the other's industry as a serious potential entrant or as a major behavioral influence.

*Equities*

13. The Court has weighed the equities, considered the Commission's likelihood of

---

**21.** Even were the Court to find that steering dampers and shock absorbers are the same product and that Tenneco manufactures both, the Commission's position would not be greatly enhanced. Tenneco's combined shock absorber and steering damper production amount to no more than .3% of the market. Only one horizontal merger case has been cited in which the market share was as low as .3%. *FTC v. PepsiCo, Inc.,* 477 F.2d 24 (2d Cir. 1973). Although even slight aggregations are viewed with suspicion in a highly concentrated market, *United States v. ALCOA,* 377 U.S. at 279, 84 S.Ct. 1283, "foreclosure of a *de minimus* share of the market will not tend 'substantially to lessen competition.'" *Brown Shoe Co. v. United States,* 370 U.S. at 329, 82 S.Ct. at 1526. In the context of a Section 13(b) preliminary injunction proceeding where a strong showing must be made, some evidence should be brought forth as to why such a borderline percentage is of antitrust significance.

Similarly, were the Court to find that Tenneco is a manufacturer of both products but that steering dampers and shock absorbers are in different product lines, the Court would have little with which to work. Virtually no evidence has been submitted on what percentage of the steering damper market would be foreclosed by the acquisition, and the $283,000 worth of shock absorbers amounts to no more than .1% of the relevant market, a percentage suggestive of a *de minimus* share.

Finally, even if Tenneco is viewed as a manufacturer for antitrust purposes, including its resales of shock absorbers and steering dampers at the same competitive level as the sales of its manufacturer-suppliers involves double counting of the same units. Thus, the .3% and .1% market share representations are inflated.

**22.** The edge effect doctrine has rarely been applied to the merger of corporations that manufacture different products (shock absorbers and exhaust system parts) as opposed to a firm seeking to expand geographically by acquisition of a corporation in the same business. *United States v. El Paso Natural Gas Co.,* 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); *United States v. Falstaff Brewing Corp.,* 410 U.S. 526, 93 S.Ct. 1096, 35 L.Ed.2d 475 (1973). This fact overlies any consideration of Walker's or Monroe's ability or incentive to enter the other's field of commerce. Although *FTC v. Proctor & Gamble Co.,* 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967) is a product extension merger case, it involved the probable anticompetitive effects that may arise when a large firm with a "deep pocket" buys into a market inhabited by small "pygmy sized" companies. The shock absorber and exhaust system parts markets are already inhabited by firms with "deep pockets" including the principal three automotive corporations.

ultimate success, and concludes that it has not shown that the issuance of a preliminary injunction would be in the public interest.